603 F.2d 953
 195 U.S.App.D.C. 371
 ASSOCIATION OF AMERICAN RAILROADS, Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
McLEAN TRUCKING COMPANY, Ryder System, Inc., and Smith's
Transfer Corporation, Petitioners,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
The GREYHOUND CORPORATION and Greyhound Lines, Inc., Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
NATIONAL ASSOCIATION OF MOTOR BUS OWNERS, Petitioner,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
ARKANSAS-BEST FREIGHT SYSTEM, INC. and Arkansas Best
Corporation, Petitioners,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
Merchants, Inc., et al., Intervenor.
TCO INDUSTRIES, INC., and Continental Trailways, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
AMERICAN TRUCKING ASSOCIATIONS, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
OVERNITE TRANSPORTATION COMPANY, Petitioner,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
COOPER-JARRETT, INC., Petitioner,
v.
The UNITED STATES of America and the Interstate Commerce
Commission, Respondents.
 Nos. 75-2011, 75-2033, 75-2061, 75-2065, 75-2108, 75-2168,
75-2169, 76-1087 and 76-1215.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 22, 1979.
Decided June 27, 1979.
As Amended Sept. 17, 1979.
 
 Richard J. Flynn, Washington, D. C., for petitioner Ass'n of American Railroads in No. 75-2011.
 E. Barrett Prettyman, Washington, D. C., with whom Jack McKay, Washington, D. C., and W. L. McCracken, Phoenix, Ariz., were on the brief, for petitioners The Greyhound Corp. and Greyhound Lines, Inc. in No. 75-2061. Also present argument for all other carriers.
 David G. MacDonald and John Guandolo, Washington, D. C., were on the brief, for petitioner McLean Trucking Co., et al., in No. 75-2033.
 Drew Carraway, John S. Fessenden and Richard A. Ward, Arlington, Va., were on the brief for petitioner National Ass'n of Motor Bus Owners in No. 75-2065.
 Everett Hutchinson, Washington, D. C., and Don A. Smith, Fort Smith, Ark., were on the brief for petitioner Arkansas-Best Freight System Inc., et al., in No. 75-2108 and intervenor in No. 75-2108.
 Mark Andrews, Eugene T. Liipfert and James C. Schultz, Washington, D. C., were on the brief, for petitioner TCO Industries, Inc., et al., in No. 75-2168.
 Nelson J. Cooney and Robert L. James, Washington, D. C., were on the brief, for petitioner American Trucking Associations, Inc. in No. 75-2169.
 William M. Blackwell and William M. Amrhein, Richmond, Va., were on the brief, for petitioner Overnite Transp. Co. in No. 76-1087.
 William Biederman, Chicago, Ill., was on the brief for petitioner Cooper-Jarrett, Inc. in No. 76-1215.
 Henry F. Rush, Atty., I. C. C., Washington, D. C., for respondents. Mark L. Evans, Gen. Counsel, Kenneth G. Caplan, Deputy Associate Gen. Counsel, I. C. C., Barry Grossman and Robert Lewis Thompson, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 
 
 1
 Charles H. White, Jr., Atty., I. C. C., Washington, D. C., entered an appearance for respondent I. C. C.
 
 
 2
 John H. D. Wigger and Robert B. Nicholson, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent U. S.
 
 
 3
 Before MacKINNON and WILKEY, Circuit Judges, and RICHEY*, District Judge.
 
 
 4
 Opinion for the Court filed by District Judge CHARLES R. RICHEY.
 
 CHARLES R. RICHEY, District Judge:
 
 5
 In this case, the Association of American Railroads and numerous non-rail petitioners and intervenors seek review of two orders of the Interstate Commerce Commission ("ICC" or "the Commission") in ICC Docket No. Ex Parte 275, Expanded Definition of Term "Securities".[1] The original ICC order was entered on September 5, 1975 ("the 1975 Order"), 348 I.C.C. 288 (1975), and it was modified by an order of May 13, 1977 ("the 1977 Order"), 354 I.C.C. 10 (1977). Together, these orders decreed broadened definitions of the statutory terms found in section 20a of the Interstate Commerce Act, 49 U.S.C. § 11301 (formerly 49 U.S.C. § 20a); these new definitions greatly increase the number and variety of financial transactions requiring ICC approval.[2]
 
 
 6
 Petitioners assert that the 1975 Order should be set aside for two reasons. First, they submit that, as a result of inadequate notice of the proposed rulemaking, the ICC failed to comply with the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551-706. Second, they contend that the 1975 Order promulgated a definition of the statutory phrase "securities"[3] which was beyond the scope of section 20a of the Interstate Commerce Act, ("section 20a"), 49 U.S.C. § 11301(a)(2) (formerly 49 U.S.C. § 20a).[4] After an analysis of the language and background of section 20a, the Court finds that the 1975 Order exceeds the scope of the Commission's statutory authority. It finds further that, without the 1975 Order, the 1977 Order lacks a rational basis and must also be set aside. Because the Court sets aside these orders for exceeding ICC authority, it need not reach the issues raised by petitioners regarding the Commission's compliance with the procedural requirements of the Administrative Procedure Act.
 
 
 7
 Before discussing the history and construction of section 20a, we summarize both the statutory scheme and the lengthy history of the ICC's attempts to promulgate the provisions which are at issue.
 
 I. BACKGROUND
 
 8
 A. Section 20a.
 
 
 9
 Section 20a establishes ICC approval as a prerequisite to a carrier's[5] issuance of "securities;"[6] securities are defined as "any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier . . .."[7] 49 U.S.C. § 20a(2) (1976) (current version at 49 U.S.C. § 11301(a)(2)). Subsection 2 of 20a is the focal point of this petition for review; this provision[8] states:
 
 
 10
 (2) It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed "securities") or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose: Provided, That nothing in this section is to be construed as applying to securities issued or obligations or liabilities assumed by the United States or any instrumentality thereof, or by the District of Columbia or any instrumentality thereof, or by any State of the United States, or by any political subdivision or municipal corporation of any State, or by any instrumentality of one or more States, political subdivision thereof, or municipal corporations.
 
 
 11
 Subsection 4 of section 20a establishes the procedural mechanism by which a carrier may obtain ICC approval of its securities. Under subsection 4, the ICC is authorized to prescribe the "form" of the application for approval as well as the "matters" which the application must contain. Id. § 20a(4).[9] The Commission, of course, also has the power to grant or deny, in whole or in part, the carrier's application.
 
 
 12
 Subsection 9 of the statute, however, exempts from the approval requirement notes which mature within two years of the date of issuance and which, together with all other such notes, comprise less than five percent of the par value of the carrier's outstanding securities. Id. § 20a(9).[10] Yet, even when exempt notes are issued, the carrier must still file a notification similar to the regular application for approval. Id.[11]
 
 
 13
 The Commission's review of carrier applications is supplemented by the mandate of subsection 6 of section 20a. This provision requires the ICC to file a copy of the carrier's application with the governor of each state in which the carrier operates and to allow the "appropriate State authorities" to comment upon the application. Id. S 20a(6).[12] This subsection expressly authorizes the Commission to hold hearings to assist its review of the matter. Id.[13]
 
 
 14
 Finally, subsection 11 establishes sanctions for non-compliance. Securities issued, or obligations assumed, without ICC authorization or without compliance with the conditions of such authorization are void; in addition, civil liabilities, as well as criminal penalties, may be imposed on the directors, officers, and agents responsible for the improper issuance. Id. § 20a(11).[14] Thus, section 20a enacts a comprehensive scheme for the regulation of the issuance of a carrier's securities.[15]
 
 
 15
 B. The 1975 and 1977 Orders.
 
 
 16
 In Ex Parte 275, Expanded Definition of Term "Securities," 348 I.C.C. 288 (1975), the Commission greatly expanded the definition of the term "securities," as employed in section 20a(2) (current version at 49 U.S.C. § 11301(a)(2)). Under this new standard, it was decreed that the statutory language, "evidence of interest in or indebtedness of the carrier," included: (1) advances payable to affiliated companies; (2) loan agreements; (3) credit agreements; (4) mortgages; (5) chattel mortgages; (6) deeds of trust; (7) equipment trusts; (8) security agreements; and (9) purchase agreements covering property having a useful life in excess of one year.[16] 348 I.C.C. at 319. In addition, the Commission's order construed the statutory phrase, "assume any obligation or liability . . . in respect of the securities of any other person,"[17] to include a carrier's advance of funds to an affiliated company. Id. In 1977, the Commission amended Ex Parte 275 by deleting several controversial filing requirements established in appendix C to the 1975 Order. These requirements concerned the information which a carrier had to submit as part of its application for authorization. Expanded Definition of Term "Securities," 354 I.C.C. 10, 22 (1977), Amending 348 I.C.C. 288, 318 (1975). Together, the 1975 and 1977 Orders represented the culmination of a review process which had started in 1971.
 
 
 17
 The history of this rulemaking proceeding is significant. On April 7, 1971 the ICC first published a notice of proposed rulemaking regarding the definition of the term "securities,"[18] as contained in 49 C.F.R. § 1115.2(c).[19] 36 Fed.Reg. 6595 (1971). At that time, the phrase had been defined to include only the traditional forms of securities, like bonds, notes, and capital stock. In its notice, the ICC indicated that a change in the definition was rendered necessary because in "the present-day situation . . . a substantial amount of financing by carriers is represented by instruments other than . . . the traditional forms of securities." Id. The Commission proposed to amend the definition to include "conditional sale contracts, chattel mortgages, security agreements, mortgages, deeds of trust, loan agreements, credit agreements, and advances." Id. (to have been codified at 49 C.F.R. § 1115.2(c)).
 
 
 18
 A year later, the Commission issued a report and an order concerning the proposed rulemaking. Expanded Definition of Term "Securities," 340 I.C.C. 817 (1972) ("the 1972 Order"). After reviewing the opposition to the proposed rule, the ICC concluded:
 
 
 19
 (It) appears that the past interpretation of the term "securities" by this Commission to include stocks, bonds, notes, and instruments that read like notes was essentially the fair and correct interpretation of section 20a of the act.
 
 
 20
 340 I.C.C. at 824. The Commission, however, reasserted its conviction that changes in the financing practices of carriers necessitated corresponding changes in ICC practice. As a result, it decided to adopt amendments to the application form[20] for ICC approval of section 20a securities. 340 I.C.C. at 826.
 
 
 21
 The 1972 Order, however, was never put into effect. During the time period within which petitions for reconsideration could be filed, the ICC, on its own motion, decided to re-open the proceeding. The Commission explained that reconsideration was appropriate because "new matter" had come to its attention.[21] The following year, the ICC entered a second report and order. Expanded Definition of Term "Securities," 344 I.C.C. 114 (1973) ("the 1973 Order"). Although this order significantly broadened the definition of "securities," See 344 I.C.C. at 146, the ICC stayed its effective date, pending review of numerous petitions for reconsideration. As a result of this review, the ICC elected to let stand its stay of the 1973 Order and to enter, in place of that order, the 1975 Order which rests at the heart of this lawsuit.
 
 
 22
 In the order presently under review, the ICC adopted yet another definition of the term "securities;" it also propounded, for the first time, a construction of the statutory phrase "assume any obligation or liability." Expanded Definition of Term "Securities," 348 I.C.C. 288 (1975). In sum, the Commission ruled:
 
 
 23
 It is ordered, That the term "securities" as found in section 20a of the Interstate Commerce Act be henceforth interpreted as including, among other things, those instruments specifically enumerated in section 20a(2) as well as other evidences of interest in or indebtedness of carriers, which include, but are not limited to advances payable to an affiliated company, loan agreements, credit agreements, mortgages, chattel mortgages, deeds of trust, equipment trusts, security agreements, and purchase agreements of property having a useful life in excess of 1 year whose terms provide for other than full payment at the time of consummation, but shall not at this time be interpreted to include agreements entered into for the sole purpose of acquiring motor carrier operating equipment.
 
 
 24
 It is further ordered, That the terms "assume any obligation or liability" as found in section 20a of the Interstate Commerce Act be henceforth interpreted as including an advance of funds to an affiliated company.
 
 
 25
 Id. at 319.
 
 
 26
 In addition to redefining the statutory language, the 1975 Order also adopted amendments to Form OP-F-200, the application form submitted by carriers as part of their request for ICC authorization. Id. at 318 (appendix C). These amendments mandated disclosure of "the amounts, terms, and purposes of all nonsecurity financing for the current year and 2 previous calendar years . . . ." Id. (appendix C, item 2(d)). They also required an applicant to submit certain financial information regarding each of its subsidiaries, and to make forecasts of its financial condition over the next 12 months. Id. (appendix C, Item 2(e)).
 
 
 27
 The changes promulgated in the 1975 Order were to become effective sixty days after publication in the Federal Register. Id. at 319. Although publication occurred on October 9, 1975, 40 Fed.Reg. 47504, the ICC later stayed the effect of its order pending appeal by the petitioners. See 40 Fed.Reg. 51199 (1975).
 
 
 28
 Yet, the Commission's review, already four years old, was still not completed. On May 7, 1976, the United States and the ICC moved this Court to remand or hold in abeyance further proceedings involving the amendments enacted in appendix C; the ICC justified its request on the ground that it needed to consider the amendments further. On July 1, 1976, this Court ordered the case held in abeyance pending reconsideration by the Commission.
 
 
 29
 Almost a year later, the ICC issued the second order presently under review. Expanded Definition of Term "Securities," 354 I.C.C. 10 (1977). Basically, in its 1977 Order, the Commission deleted appendix C's requirement that applicants disclose financial forecasts for the 12 months following the filing. Compare 354 I.C.C. at 22-23 With 348 I.C.C. at 318. More than six years after the publication of the original notice of proposed rulemaking, the ICC had at last completed its work.
 
 
 30
 After informing this Court of its final decision, the ICC, together with the United States, moved to separate the appendix C issues from the remainder of the case. On March 29, 1978, the Court denied the motion. The legality of the Commission's 1975 and 1977 Orders was finally ready for judicial review.
 
 
 31
 II. THE COMMISSION'S ORDERS MUST BE SET ASIDE BECAUSE THEY
 
 
 32
 EXCEED THE SCOPE OF SECTION 20a.
 
 
 33
 A. The Standard of Review.
 
 
 34
 At the outset, the Court must determine the standard by which the 1975 and 1977 Orders shall be reviewed. Although the Commission submits that it has broad "legislative"[22] rulemaking powers, the Court need not resolve petitioners' assertions to the contrary, because the Commission has conceded that, in this instance, it was engaged in "interpretative"[23] rulemaking.[24] Unlike legislative rules, which are entitled to judicial deference, interpretative rules are regarded as merely an agency's opinion concerning the meaning of the law. As such, they neither create law nor have an effect beyond the statutory provision which they interpret. Accordingly, interpretative rules reflect an administrative construction on a question of law reviewable in the courts. Citizens to Save Spencer County v. EPA, 195 U.S.App.D.C. ----, ----, 600 F.2d 844, 876 (1979).
 
 
 35
 Apart from the standard of review, the Court believes it important to clearly delineate the scope of its review. In its 1975 Order, the ICC interpreted section 20a(2)'s language to include ten different business transactions, 348 I.C.C. at 319, and in its order issued two years later, the Commission amended the relevant application form to require disclosure of a myriad of financial details. In theory, a perfectly comprehensive evaluation of the two orders would involve an analysis of section 20a's scope in relation to each proposed business transaction and also, in relation to all the details of the new application form. Such an evaluation would require the Court to reach out and examine hypothetical situations not directly raised by this appeal. The Court, however, is limited to an examination of the case or controversy[25] which the parties have presented. See National Student Association v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103, 1110 (1969); Textile and Apparel Group v. FTC, 133 U.S.App.D.C. 353, 410 F.2d 1052, 1053-55 (D.C.Cir.), Cert. denied, 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185 (1969). As part of this limitation, its review need only be as "concrete" as the question presented. Because the basic issue raised by this appeal is "a purely legal one" the intended scope of section 20a, the Court may resolve this question without determining the status of each transaction which the Commission seeks to regulate. Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); K. Davis, Administrative Law Treatise § 21.00 (1970 Supp.).
 
 
 36
 Once the Court finds that the ICC orders clearly exceed the boundaries of section 20a, it may set aside those orders without determining what portion, if any, may be valid under the statute. After examining the statute's language and purpose, the Court gives section 20a an interpretation different from that of the ICC and under this interpretation, it is clear that the Commission has incorrectly construed the statutory definition of the term "securities." Because the Commission's construction leads to improper results, the orders must be set aside. The Court thus provides the Commission with an opportunity to analyze and implement the interpretation which this decision delineates. In the course of the Commission's work, it will be able to assess the specific business transactions which fall within its jurisdiction. Future controversies can then be resolved on a case-by-case basis, as more concrete fact situations are presented.
 
 
 37
 Apart from the limitations of Article III, policy reasons also compel a unitary, rather than a particularistic, review of the 1975 and 1977 Orders. The two orders are clearly part of a single regulatory scheme: they reflect the ICC's attempt to bring modern methods of carrier financing within the scope of section 20a. A review of every facet of that scheme would be otiose, because setting aside one part of the plan could frustrate its purpose as readily as a complete invalidation. Cf. 2 Sutherland Statutory Construction § 44.03 (4th ed. 1973). Having decided to treat the two orders as a single scheme, the Court must set aside the entire plan of regulation if it finds significant portions of that scheme invalid.
 
 
 38
 B. The Commission's 1975 Order Does Not Comport With the
 
 
 39
 Language of Section 20a.
 
 
 40
 Section 20a(2) requires ICC approval before a carrier may "issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier . . . ." 49 U.S.C. § 20a(2) (1976).[26] In its 1975 Order, the Commission interpreted the third portion of this statutory phrase, "other evidence of . . . indebtedness," to refer to several types of financing which bear no resemblance to the stocks and bonds expressly mentioned in the first two portions of the phrase. In particular, the Court notes the ICC's inclusion of advances payable to an affiliated company as well as all loan, credit and security agreements. 348 I.C.C. at 319. In addition, the Commission also construed the clause in section 20a(2) which mandates ICC approval before a carrier may "assume any obligation or liability . . . in respect of the securities of any other person . . . ." 49 U.S.C. § 20a(2) (1976).[27] The ICC read this clause to include a carrier's advances of funds to an affiliated company. 348 I.C.C. at 319. After reviewing the language of section 20a, this Court concludes that the Commission's construction of the statute is at variance with the intent of Congress, as expressed in the statutory language. It also fails to conform to the legislative history.
 
 
 41
 "The starting point in every case involving the construction of a statute is the language itself." International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 556, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). With respect to the first portion of the 1975 Order, which concerns "other evidence of . . . indebtedness," the ICC, in approaching section 20a(2), has clearly overlooked both the limited scope of the statutory scheme as well as the familiar doctrine of construction, Ejusdem generis.
 
 
 42
 The rule of Ejusdem generis[28] is a common sense doctrine which teaches: "Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A Sutherland Statutory Construction § 47.17, at 103 (4th ed. 1973) (footnotes omitted); See Weyerhauser Steamship Co. v. United States, 372 U.S. 597, 600-01, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); Cleveland v. United States, 329 U.S. 14, 18, 67 S.Ct. 13, 15, 91 L.Ed. 12 (1946) ("Under the Ejusdem generis rule of construction the general words are confined to the class and May not be used to enlarge it " (emphasis added)); United States v. Salen, 235 U.S. 237, 249, 35 S.Ct. 51, 59 L.Ed. 210 (1914); United States v. Stever, 222 U.S. 167, 174, 32 S.Ct. 51, 53, 56 L.Ed. 145 (1911) ("(U)nless there is a clear manifestation to the contrary, general words, not specific or limited, should be construed as applicable to cases or matters of like kind with those described by the particular words."); United States v. Brown, 536 F.2d 117, 121 (6th Cir. 1976). A statutory reference to "other" objects of a general nature, as in section 20a(2), most frequently calls for the application of the doctrine.
 
 
 43
 The Court presumes that Congress did not employ superfluous language in drafting section 20a(2). Yet, by reading the statute to include stocks and bonds as well as financing dissimilar to these securities, the ICC has rendered nugatory the statute's express reference to specific securities. Under the ICC's interpretation, Congress granted the Commission jurisdiction over All "evidence(s) of . . . indebtedness of" a carrier. The statute, however, clearly carries no such grant of authority. It merely creates an authorization requirement for a carrier's stocks and bonds. With respect to other types of financing, the meaning of section 20a(2) is plain: the ICC may regulate "other evidence of interest in or indebtedness of" a carrier only when that "evidence" is of like kind to stocks or bonds.
 
 
 44
 This construction gives effect to every word in the statute. There are, of course, many forms of "interest in" a carrier which are substantially similar to capital stock. For example, as the Commission ruled in Norfolk & Western Railway Co. Stock, 333 I.C.C. 1 (1968), warrants certainly fall within the scope of this broadly phrased portion of section 20a(2). With respect to the "indebtedness of" a carrier, no one contests that, under this portion of the statute, certain notes are subject to regulation by the Commission. These notes evidence an obligation similar to bonds.
 
 
 45
 The Court draws further support for its reading of section 20a(2) from the statute's use of the words "issue" and "proceeds." Referring to the securities which the ICC must approve, section 20a(2) requires an "investigation by the commission of the purposes and uses of the proposed Issue and the Proceeds thereof . . . ." 49 U.S.C. § 20a(2) (1976) (emphasis added).[29] Although both words are commonly used in connection with stock, bonds, and the like, they are awkward and meaningless when employed in the context of many of the financial transactions specified in the 1975 Order. For example, an intercompany advance can hardly be described as "issued"[30] or creating "proceeds."[31]
 
 
 46
 In addition to the plain language of section 20a(2), the entire scheme of the statute compels the Court to restrict its scope to obligations that are generally similar to stocks and bonds. The law establishes a prolix and cumbersome process for the authorization of securities. Under this process, the ICC must conduct investigations, provide notice to governors of all affected states, and make specific findings regarding the purpose and use of the proceeds of the issue. Although the issuance of securities, which is generally part of a major financing, may warrant this type of review, the Court cannot accept the proposition that Congress intended this process to apply to the minor, quotidian transactions covered in the Commission's 1975 Order.
 
 
 47
 Moreover, the ICC's order cannot be squared with two statutory exemptions to section 20a's authorization process. First, section 20a(9) (formerly 49 U.S.C. § 20a(9) (1976)),[32] exempts from coverage "notes . . . maturing not more than two years after the date thereof"[33] and aggregating, together with all other such notes, not more than five percent of the par or fair market value of the carrier's outstanding securities. Second, under section 214, (formerly 49 U.S.C. § 314 (1976)),[34] the securities of a motor carrier are exempt if their issuance, together with all other outstanding stock and securities, does not exceed one million dollars in value. The statutory formulae employed by both exemptions would certainly be altered significantly by the 1975 Order.
 
 
 48
 In the course of numerous, daily financial transactions, either exemption could be won or lost by a carrier whose financial structure placed it near the statutory boundary. Moreover, once the instruments which the ICC proposes to regulate are valued and included in the computation of the carrier's "outstanding" securities, the scope of both exemptions will change dramatically. Under section 20a(9),[35] if the class of securities is expanded to other than pure notes, the breadth of the exemption that Congress intended for such notes may actually be reduced. Although the exemption figure would be enlarged by five percent of the total of the added "securities," the corresponding inclusion of new, short term "securities" within that five percent could ultimately serve to cut back the scope of section 20a(9). If, however, most of the newly designated securities mature more than two years after issuance, the five percent figure will increase and new transactions will not be included within that figure. As a consequence, there may be a tremendous gap in ICC regulation over stocks, bonds, and other instruments which Congress clearly intended the Commission to scrutinize. A similar result follows under section 214 of the Interstate Commerce Act (formerly 49 U.S.C. § 314 (1976)).[36] Although motor carriers with less than one million dollars in outstanding securities are exempt from section 20a's filing requirements, if the transactions specified in the 1975 Order are included in the computation of the million dollar exemption, many small carriers will be forced to submit section 20a filings. Yet again, Congress clearly intended to exempt them from the burden of compliance.
 
 
 49
 Although the exemptions provided by sections 20a(9) and 214 are not large, they are reasonable in relation to the controlling statute. Both exemptions are narrow and the narrowness befits a regulatory scheme which is limited in scope. Yet, by broadening the regulatory scheme to include more than Congress intended, the Commission would defeat the exemptions which Congress sought to provide. These distortions in the intended regulatory scheme are strong evidence of the impropriety of the Commission's interpretation.
 
 
 50
 Up to this point, the Court's discussion has been limited to the 1975 Order's first portion, in which the ICC construed section 20a(2)'s phrase "other evidence of interest in or indebtedness of the carrier." However, the analysis reflected in that discussion is also fully applicable to the second portion of the order. Moreover, the ensuing discussion, which concerns legislative and judicial treatment of section 20a, is equally relevant to both portions of the ICC's ruling.
 
 
 51
 The second portion of the 1975 Order examined the statute's requirement that carriers receive ICC approval before they "assume any obligation or liability" with respect to another's securities.[37] The ICC construed this phrase to include a carrier's "advance of funds to an affiliated company." 348 I.C.C. at 319. These advances partake of the same characteristics as the other transactions enumerated in the 1975 Order and, for the reasons previously stated, they fall outside the scheme of section 20a. Moreover, in this instance the ICC's interpretation of the statutory language is especially tortuous. Although advances are accounts receivable, which appear as assets on the carrier's balance sheet,[38] the Commission here looks to the affiliate's debt to the carrier and deems that debt an "evidence of indebtedness." As such, it is converted into a security within the scope of section 20a and the carrier, in some unexplained fashion, is treated as "assuming an obligation" with respect to it. The carrier's sole obligation, however, is to act as a creditor. The Court can only conclude that, if Congress had intended the Interstate Commerce Act to reach such transactions, it would have expressed itself in an intelligible fashion.
 
 
 52
 In defense of its position, the Commission asserts that the 1975 Order is a necessary response to carriers' decreasing emphasis on traditional financing, such as stock, bonds, and notes. Carriers, the ICC explains, have grown to rely on both long-term conditional or deferred equipment obligations, as well as advances from affiliates. The Commission notes that in 1971, carriers purchased $384 million in equipment, but only $14 million of this amount was submitted to the Commission for approval.[39] Relying on National Petroleum Refiners Association v. FTC, 157 U.S.App.D.C. 83, 482 F.2d 672 (1973), Cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), the Commission concludes that these business changes justify a change in administrative practice.
 
 
 53
 The Commission's argument, however, is faulty: it assumes the very proposition which is at issue in this case. The Court here is called upon to decide whether the ICC's jurisdiction under section 20a extends to the transactions specified in the 1975 Order; it need not and does not determine the wisdom of the exercise of such authority were it to exist. Although National Petroleum Refiners Association v. FTC, supra, at 691, indicates that "novel assertions of agency powers" may sometimes be justified by changes in circumstance, the "novel assertion" in that case was also "a widely utilized practice throughout our administrative agencies." 482 F.2d at 692. There is certainly no wide acceptance of the statutory construction which the ICC now proposes to incorporate into a rule and, for this reason, National Petroleum Refiners is not relevant. This Court, like the ICC, is bound by the intent of Congress, as expressed in the language of the statute. Assuming the correctness of the Commission's data concerning modernization, the Court can only respond that, more than half a century after the passage of the Transportation Act of 1920,[40] changes in the financing practices of the rail and motor industry must have eluded the scope of section 20a(2). Whether the statute should be amended to reflect this shift is a matter which must now be resolved by Congress, not the ICC.
 
 
 54
 C. The Application of Judicial and Administrative Precedent
 
 
 55
 to Section 20a.
 
 
 56
 The Court's interpretation of section 20a is fully consistent with all relevant judicial precedent. Although it must be conceded that all prior judicial interpretations of section 20a have relied heavily on the ICC's pre-1975 reading of the statute an interpretation that the 1975 Order would overturn these precedents still provide clear support for the construction which this Court adopts. For example, in REA Express, Inc. v. Alabama Great Southern Railroad, 427 F.Supp. 1157 (S.D.N.Y.1976) (three-judge court), Aff'd mem. sub nom. Sowerwine v. United States, 431 U.S. 961, 97 S.Ct. 2914, 53 L.Ed.2d 1057 (1977), Judge Friendly examined the significance of the statute's use of the word "issue." He explained:
 
 
 57
 While non-negotiable debt representing an advance from an owner may fall within the letter of the term "other evidence of . . . indebtedness," one would not normally speak of a carrier's "issuing" such debt. At best, therefore, the applicability of § 20a to the contracting of non-negotiable debt would be doubtful.
 
 
 58
 427 F.Supp. at 1164.[41] Moreover, the court noted that prior ICC interpretations, which had applied the rule of Ejusdem generis to section 20a,[42] "had support in reason." Id. at 1165. In United States v. New York, New Haven & Hartford Railroad, 276 F.2d 525 (2d Cir. 1959), Cert. denied, 362 U.S. 961, 80 S.Ct. 877, 4 L.Ed.2d 876 (1960), the Second Circuit reviewed the scope of section 20a and concluded:
 
 
 59
 Appellees are quite right in saying that, in enacting 20a Congress did not grant the Commission general power to pass judgment on all obligations incurred by railroads and that, in this early essay in Federal security regulation, Congress did not enact so comprehensive a definition of "security" as it later did in the Securities Act of 1933, 15 U.S.C.A. § 77b(1), the Securities Exchange Act of 1934, 15 U.S.C.A. § 78c(a)(10), and the Public Utility Act of 1935, 15 U.S.C.A. § 79b(a)(16).
 
 
 60
 276 F.2d at 533.[43] A similar construction was applied in Interstate Investors, Inc. v. United States, 287 F.Supp. 374, 386-88 (S.D.N.Y.1968) (three-judge court), Aff'd per curiam, 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969).
 
 
 61
 Respondents seek to distinguish this line of precedent by pointing to the Commission's change in position. Yet, like the 1975 Order, the Commission's earlier readings of the statute were merely "interpretative,"[44] and, as a result, they merited little judicial deference. Under such circumstances, the courts' unanimous adoption of its reading of section 20a should be viewed as more than a judicial stroll down a path worn smooth by ICC regulation. Rather, these decisions reflect an independent consideration of the language and purpose of the statue and, as such, this Court deems them reliable and persuasive precedent.
 
 
 62
 Finally, the Court also draws support for its reading of the statute from prior ICC interpretations. For half a century, the Commission construed the term "securities" in accordance with its normal meaning. In Lehigh Valley Railroad Conditional Sale Contract, 233 I.C.C. 359 (1939), the Commission ruled that a conditional sale contract, which covered the acquisition of $1,125,000 worth of railroad equipment, was Not a security. It explained, "Considering the provisions of section 20a as a whole . . . it appears that the provisions were intended to apply to instruments negotiable or quasi-negotiable in character, such as are issued for the purpose of railroad financing." 233 I.C.C. at 365. Although a handful of ICC decisions indicate that the Commission's construction of section 20a may involve an analysis more refined than that of Lehigh Valley,[45] the ICC has regularly held that many noteless borrowings, such as mortgages, conditional sale contracts, equipment leases, loan agreements and chattel mortgages, are not securities within the scope of the statute.[46] This longstanding interpretation by the Commission itself is convincing evidence of the correctness of the Court's interpretation. See Textile and Apparel Group v. FTC, 133 U.S.App.D.C. 353, 410 F.2d 1052, 1055-57, Cert. denied, 396 U.S. 910, 90 S.Ct. 223, 24 L.Ed.2d 185 (1969).
 
 
 63
 D. The Legislative History of Section 20a.
 
 
 64
 The Commission has not presented a shred of evidence that Congress, in passing the Transportation Act of 1920,[47] intended the law to govern the transactions presently at issue.
 
 
 65
 In discussing the legislative history, the Commission has previously conceded, "Our review of the legislative history confirms the contention of the opposing parties that all references were limited to stocks, bonds, and promissory notes." Expanded Definition of Term "Securities", 340 I.C.C. 817, 824 (1972).[48] A review of the comments of Congress' leading advocates of regulation provides convincing support for this Court's interpretation.
 
 
 66
 The report of the House Committee on Interstate and Foreign Commerce on H.R. 10453, 66th Cong. 1st Sess. (1919), the bill which later became the Transportation Act of 1920, focuses unequivocally on the stocks and bonds of carriers. See H.R.Rep. No. 458, 66th Cong., 1st Sess. 21 (1919), Reprinted in 2 The Economic Regulation of Business 1448, 1467 (B. Schwartz, ed. 1973). This report is commonly called the Esch Report, and it provides this summary of the intended scope of the statute:
 
 Stock and Bond Issues
 
 67
 Section 437 gives the commission control over Stock and bond issues. In 1914 and again in 1916 the House passed bills containing almost the identical provisions now embraced in section 437. These provisions are familiar to the House and need not be dwelt upon. Suffice it to say that practically all of the witnesses indorsed the provisions of section 437. Had such provisions been on the statute books during the last 10 years the financial wrecking of such roads as the Frisco, the Rock Island, Pere Marquette, Pittsburgh Terminal, the New Haven, and others, would not have been possible. Provisions similar to those contained in section 437 are found in the statutes of several of the States. The experience of these States with the Regulation of stock and bond issues has proven successful. Without Federal control the carriers would have to be subjected to the diversified requirements of the several States. These requirements have been burdensome to the carriers and resulted in expense and delay. The enactment of the pending bill will put the control over Stock and bond issues exclusively in the hands of the Federal Government and will result in uniformity and greater promptness of action.
 
 Id. (emphasis added)
 
 68
 Representative Rayburn, who sponsored an earlier draft of the statute, also complained bitterly "that the credit of the railroads of this country is bad." 59 Cong.Rec. 8376 (1919). Yet, instead of focusing directly on the credit of the carriers, as the ICC now attempts to do, Representative Rayburn argued:
 
 
 69
 Of course, the credit of the railroads has been destroyed. But if we write into the law of the land a statute to the effect that Before a railroad can issue new securities, before it can put them on the market it must come before the properly constituted governmental agency, lay the full facts of its financial situation before that body, tell that body what it intends to do with the money derived from the sale of the issue of securities and after it has received the approval of that regulating body and it goes out and puts those Securities on the market then the Interstate Commerce Commission by this law is empowered at any time to call it to account and have it tell to that regulating body that it expended the money, the proceeds of the sale of securities, for the purposes for which it had made the application. Then we shall have railroad securities that will stand for value in the markets of this country and in the markets of all the world.
 
 
 70
 Id. (emphasis added). The control which Rayburn sought came solely in the forum of securities regulation a limited and indirect form of control. And he was not alone. Virtually every reference to the new provision was phrased in terms of federal control over "stocks and bonds"[49] or "securities."[50]
 
 
 71
 Moreover, much of the legislative debate focuses on protecting the purchasers of securities. E. g., 58 Cong.Rec. 8318 (1919) (remarks of Rep. Esch); Id. at 8376 (1919) (remarks of Rep. Rayburn); Cf. Interstate Investors, Inc. v. United States, 287 F.Supp. 374, 387 (S.D.N.Y.1968) (three-judge court) Aff'd per curiam, 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969) ("The dominant Congressional purpose in enacting (section 20a) was to protect investors in the securities of railroads . . . ."). Many of the transactions specified in the ICC's 1975 Order clearly do not involve the purchase or sale of a security. Had Congress intended section 20a to possess the novel breadth which the Commission now perceives it would certainly have articulated its desire. In the face of such silence the Court must follow the plain language of the statute.
 
 
 72
 Apart from the silent legislative record of the Transportation Act of 1920 the recent refusal of Congress to amend the statute to reach transactions which the Commission now seeks to include by rule also suggests that the 1975 Order should be set aside. Over the years the ICC has repeatedly and unsuccessfully urged Congress to expand section 20a's scope. For example in 1957 Congress declined to adopt a measure which would have extended the statute to include "conditional sale contracts and similar instruments not now considered securities . . . ." S.Rep. No. 611, 85th Cong.2d Sess. 2 (1957). Yet at the same time Congress decided to amend other parts of the regulatory scheme. Act of September 7, 1957, Pub.L. No. 85-309, 71 Stat. 631. In Kay v. FCC, 143 U.S.App.D.C. 223, 443 F.2d 638, 646-47 (1970), this Court explained that if a consistent administrative procedure has clearly been brought to the attention of Congress and Congress has not acted to change it then legislative approval of the agency position ought to be inferred. Accordingly we conclude that Congress has always perceived section 20a to authorize only the regulation of stocks bonds and similar financial instruments.
 
 
 73
 E. The 1975 Order.
 
 
 74
 In light of the foregoing, the ICC has certainly altered the definition of "securities" in a manner which is inconsistent with the intent expressed in the statute, and with the normal meaning of the term. The Commission has also construed the phrase "other evidence of interest in or indebtedness of the carrier" to include Any such evidence. This was clearly not the intent of Congress.
 
 
 75
 As Judge Friendly explained in United States v. New York, New Haven & Hartford Railroad, 276 F.2d 525, 533 (2d Cir. 1959), Cert. denied, 362 U.S. 961, 80 S.Ct. 877, 4 L.Ed.2d 876 (1960), section 20a was not designed with the broad inclusionary definitions enacted in the Securities Act of 1933 and other, later attempts at securities regulation. Nonetheless, all of these regulatory acts share a common purpose protecting the investor. Thus concern with the Issuance of securities on a Public market was the dominant theme in both the Esch Report for the Committee on Interstate and Foreign Commerce and in Representative Rayburn's explanation of the statute to the House of Representatives. Representative Rayburn urged:
 
 
 76
 I know that the public looks with suspicion upon the acts of railroads in general, and the reason for that is that the public heretofore has had the awful and the criminal example of these railroad wreckers who were able under the laws of the States through which they operated to Issue spurious securities, based upon wind and water, and which When sold to a trusting public represented in their hands nothing but a hope, but that was a vanishing hope.
 
 
 77
 Of course the credit of the railroads has been destroyed. But if we write into the law of the land a statute to the effect that Before a railroad can issue new securities, before it can put them on the market, it must come before the properly constituted governmental agency, lay the full facts of its financial situation before that body, tell that body what it intends to do with the money derived from the sale of the Issue of securities, and after it has received the approval of that regulating body and it goes out and Puts those securities on the market, then the Interstate Commerce Commission by this law is empowered at any time to call it to account and have it tell to that regulating body that it expended the money, the proceeds of the sale of securities, for the purposes for which it had made the application. Then we shall have railroad securities that will stand for value In the markets of this country and In the markets of all the world.
 
 
 78
 58 Cong.Rec. 8376 (1919) (emphasis added).
 
 
 79
 Although the Commission's orders purport to achieve this same end, they employ a process inconsistent with the intent of Congress. In section 20a, the Interstate Commerce Act draws a distinction between a carrier's recurring financial transactions and its major financings made through the issuance of securities. By instructing the ICC to examine the "the purposes and uses of the proposed issue and the proceeds thereof,"[51] Congress intended the Commission to bar the issuance of securities if it discovered that the carrier's credit arrangements, mortgages, and the like, were inadequate. Congress, however, did not authorize the Commission to review and preclude All financial transactions which might occur After the Commission had authorized the securities and the issue had produced the proceeds for the approved purpose. Section 20a permits the ICC to deny or authorize the issuance based on the carrier's use of the proceeds derived from the issuance; it does not permit direct intervention in the use of those proceeds. By reading the statutory phrase "indebtedness," to encompass all types of debt, however achieved, the Commission's 1975 Order is an attempt to accomplish this forbidden goal, and, as such, it must be set aside.
 
 
 80
 Although the breadth of the 1975 Order mandates reversal, the Court does not hold that all ten transactions enumerated in that order could Never be securities within the meaning of section 20a. After a review of the statutory language and the legislative history, the Court finds that there are two salient factors in determining whether a particular transaction is a security under section 20a(2). First, it must be a security, and reference to other areas of federal securities regulation will be helpful in interpreting that term. Secondly, the statute and the legislative history indicate that Congress intended to limit the statute to Issues of securities.[52] This would generally mean public issues sold on the market, but could also include a substantial volume of securities sold in a private placement.
 
 
 81
 First, congressional concern with the prospect of valueless securities being traded on a public market has already been documented.[53] After an independent examination of the legislative record, this Court concludes that Congress primarily intended to reach financings in which the instrument was publicly issued and publicly traded. First, all of the instruments referred to by the legislators were publicly tradable. It is also apparent that Congress intended to protect investors who purchased carrier securities which were publicly issued and publicly traded. Finally, absent an opportunity for the public to purchase the purported security, there is no need to provide the appropriate governors with notice and to conduct an investigation into the issuance of that security. Accordingly, the Commission has no authority under Section 20a to expand its jurisdiction and enter the field. If a carrier's other transactions jeopardize the value of its issued securities, the Commission must resolve the problem in some other manner. Its authority over the issuance of securities is not a catch-all grant of power.
 
 
 82
 Second, it seems appropriate to adopt, to some extent, the test for a "security" which Congress has developed under other statutes. The Court finds the informal use of the term "securities," both in the text of the original statute and by the enacting legislators in their discussion of the law,[54] strong evidence of Congress' intent to regulate financings which are, in fact, securities. Indeed, if this were not the case, use of this shorthand definition would make little sense. Moreover, the test which has developed in other areas reflects the sound distinction drawn between a security, which is a genuine investment, and other transactions, which may involve a mere sale of goods on an installment basis or the like.[55] In International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1976), the Supreme Court summarized the quintessential definition of a security as "an investment of money in a common enterprise with profits to come solely from the efforts of others."[56] Once this sort of investment is shown, the "evidence of interest in or indebtedness of the carrier" would be substantially similar to the stocks and bonds expressly mentioned in section 20a and would thereby harmonize with the doctrine of Ejusdem generis. Of course, by adopting the common thread which runs through the federal definitions of the term "security," the Court is not accepting In haec verba the definitions provided by the Securities Act of 1933 and the Securities Exchange Act of 1934.[57] The precise contours of section 20a's use of the term "securities" can only be developed on a case-by-case basis, along with the assistance and expertise of the ICC. The two factors which the Court holds critical are intended only to resolve the controversy presented by the instant case whether the 1975 Order comports with the scope of section 20a.
 
 
 83
 The boundaries of section 20a having been sketched, a brief analysis of the specific transactions enumerated in the 1975 Order clearly indicates the impropriety of the ICC's ruling. For example, advances, whether from an affiliate to a carrier or vice-versa, certainly lack the salient features of a security under section 20a. These intercompany transactions, which may be evidenced by a mere notation on the carrier's accounting books,[58] can be neither issued nor traded on a public market. For the same reason, many loan and credit agreements may also fall outside the scope of the statute. Yet, if such agreements were evidenced by a negotiable, tradable document, which reflected a bona fide investment, then that instrument could well meet the statutory test. Equipment trust certificates, on the other hand, are commonly recognized as securities. Mortgages, chattel mortgages, deeds of trust, security agreements and purchase agreements covering property having a useful life in excess of one year, must all benefit from a similar analysis. The ICC is incorrect in asserting that these five transactions are Always securities within the meaning of section 20a. Yet, on occasion, some of these financings, either alone or in conjunction with other instruments, may possess the salient features of a section 20a security and then the Commission may exercise the authority granted in the Transportation Act of 1920.
 
 
 84
 Although the distinctions which the Court draws in this opinion are broad, and, perhaps, hazy, they are as concrete as the issue presented. In resolving the question of whether the ICC may regulate certain specified transactions, the Court is not called upon to evaluate every conceivable factual variation which may arise. It need only draw a rough standard to discern the fact that the Commission has exceeded its statutory authority. Refinement and articulation await both more concrete factual situations as well as further deliberation by the ICC.
 
 
 85
 F. The 1977 Order.
 
 
 86
 Unlike the 1975 Order, the 1977 Order does not rely wholely on section 20a(2). Instead, it is established pursuant to section 20a(4),[59] which expressly authorizes the ICC to prescribe the form and contents of applications for approval under section 20a(2). Petitioners contend that the form[60] promulgated in the 1977 Order is defective for want of proper notification and because it is arbitrary and capricious. The ICC, on the other hand, asserts that the notice of a proposed change in the definition of "securities" "implicitly carried with it constructive notice"[61] that amendments in the form might be necessary. Moreover, the ICC replies, "the kind of data covered by the . . . amendment is necessary."[62] Without resolving any of the foregoing, the Court finds that it must also set aside the 1977 Order.
 
 
 87
 The amendments to the authorization form are undeniably an integral part of the regulatory scheme enacted in the 1975 Order. Indeed, the 1977 Order was really an amendment to appendix C of the 1975 Order. The present record indicates that the information required by the new form is intended to aid Commission review of the ten transactions which it has recently deemed securities. Once the Court has removed the ICC's authority to review those transactions, it must also set aside implementing regulations. By setting aside the 1975 Order, the Court has removed the rational basis for the later order, thereby rendering it arbitrary and capricious. In sum, the 1977 Order no longer meshes with the regulatory scheme. Although the Commission may later determine that this data is necessary to effectively regulate bona fide securities, there is nothing in the present record to support that conclusion.
 
 III. CONCLUSION
 
 88
 The ICC, in its 1975 Order, has enacted a definition of the statutory term "securities" which, in its breadth, exceeds the statutory grant upon which it must rest. In enacting section 20a of the Interstate Commerce Act, Congress never intended to authorize the Commission to regulate All forms of "interest in or indebtedness of" a carrier. Instead, the legislators perceived a limited role for the Commission, one which it has carried out for over fifty years. In this opinion, the Court has delineated the rough outer boundary of that role and, in the process, found that the 1975 Order exceeds the Commission's jurisdiction. Because, in setting aside the 1975 Order, the Court removes the basis for the Commission's 1977 Order, that later order must also be set aside.
 
 
 89
 These orders are thus vacated and set aside.
 
 
 90
 Judgment accordingly.
 
 
 
 *
 Charles R. Richey, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 The Association of American Railroads ("AAR") is a voluntary, not-for-profit association, the members of which include substantially all of the Class I railroads in the United States. The AAR participated in the proceedings before the ICC on behalf of its members. The non-rail petitioners and intervenors are carriers of freight or passengers by motor vehicle or their representatives. They are: Greyhound Lines, Inc.; The Greyhound Corp.; Trailways, Inc.; The American Bus Association; McLean Trucking Co.; Arkansas-Best Freight System, Inc.; Cooper-Jarrett, Inc.; and the American Trucking Associations, Inc
 
 
 [2]
 The Court has jurisdiction over this petition pursuant to 28 U.S.C. §§ 2321(a) & 2342(5) (1976)
 
 
 [3]
 For the sake of convenience, "securities" is used here as a shorthand for the statutory phrase, "any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier . . .." This term is employed in an identical fashion by section 20a (current version at 49 U.S.C. § 11301(a)(2)) and the ICC. See note 4 Infra
 
 
 [4]
 Section 20a was originally enacted into the Interstate Commerce Act as § 439 of the Transportation Act of 1920, 41 Stat. 494. The Interstate Commerce Act was recently revised and codified and, as a result, the former 49 U.S.C. § 20a may now be found, in large part, at 49 U.S.C. § 11301. This revision was not intended to enact substantive changes. Revised Interstate Commerce Act, Pub.L. No. 95-473, § 3(a), 92 Stat. 1466 (1978); H.R.Rep. No. 1395, 95th Cong., 2d Sess. 9-10 (1978). Because the ICC relied on the language of the original Act, the Court, in the interest of clarity and expedience, will continue to refer to the statute as section 20a and will likewise quote its original text. See Southern Ry. Co. v. Seaboard Allied Milling Corp., --- U.S. ----, ---- n.1, 99 S.Ct. 2388, n.1, 60 L.Ed.2d 1017 (1979)
 
 
 [5]
 Section 20a(1) of the Interstate Commerce Act (current version at 49 U.S.C. § 11301(a)(1)) provides a definition of the term "carrier." The former 49 U.S.C. § 314 (current version at 49 U.S.C. § 11302) makes section 20a applicable to motor carriers
 
 
 [6]
 See note 3 Supra
 
 
 [7]
 The Interstate Commerce Act was revised and codified in October 1978 without substantive change. See note 4 Supra. For the sake of convenience, the Old Interstate Commerce Act will be quoted in the text and parallel citations to, and quotations from, the newly worded Act will appear in the footnotes. Here, 49 U.S.C. § 11301(a)(2) defines a "security" as "a share of capital stock, a bond, or other evidence of interest in or indebtedness of, a carrier."
 
 
 [8]
 Section 20a(2) appears for the most part at 49 U.S.C. §§ 11301(a)(2), (b) (1), & (d)(1), which provide:
 (a) In this section
 (2) "security" means a share of capital stock, a bond, or other evidence of interest in, or indebtedness of, a carrier.
 (b)(1) Subject to subchapter I of chapter 2A, chapter 2B, and subchapter I of chapter 2D of title 15, the Commission has exclusive jurisdiction to approve the issuance of securities by a carrier and the assumption of an obligation or liability related to the securities of another person by a carrier. A carrier may not issue securities or assume those obligations or liabilities without the approval of the Commission. No other approval is required. A security issued or obligation or liability assumed by a carrier in violation of this subsection or in violation of a condition prescribed by the Commission under subsection (d) of this section is void. However, a security or obligation issued or assumed under authority of this section is not void for failure to comply with a procedural requirement of this section or other matter preceding entry of the order of the Commission.
 (d)(1) The Commission may begin a proceeding under this section on application of a carrier. Before taking final action, the Commission must investigate the purpose and use of the securities issue or assumption and the proceeds from it. The Commission may approve any part of the application and may require the carrier to comply with appropriate conditions. After an application is approved under this section, the Commission may change a condition previously imposed or use that may be made of the securities or proceeds for good cause shown subject to the requirements of this section. The Commission may approve an application under this section only when it finds that the securities issue or assumption
 (A) is for a lawful object within the corporate purpose of the carrier and reasonably appropriate for that purpose;
 (B) is compatible with the public interest;
 (C) is appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier; and
 (D) will not impair the financial ability of the carrier to provide the service.
 
 
 [9]
 Section 20a(4) is now implied in 49 U.S.C. § 10321(a). H.R.Rep. No. 1395, 95th Cong., 2d Sess. 154 (1978)
 
 
 [10]
 Section 20a(9) is currently codified, for the most part, at 49 U.S.C. § 11301(b)(2). Under both the original statute, and the recent codification, the fair market value of a carrier's securities is employed as a standard when the securities lack a par value
 
 
 [11]
 This portion of section 20a(9) has been revised and codified at 49 U.S.C. § 11301(c)(1)
 
 
 [12]
 Section 11301(d)(2) of title 49, U.S.C., as revised and codified, provides:
 An application or certificate must be made under oath and signed and filed for the carrier by a designated executive officer who knows the matters stated in the application or certificate. On receipt of an application of a carrier under this section, the Commission shall have a copy of the application served on the chief executive officer of each State in which that carrier operates. The appropriate authorities of those States are entitled to be admitted as parties to a proceeding under this section to represent the rights and interests of their people and States.
 
 
 [13]
 Id
 
 
 [14]
 Section 20a(11) has been revised and codified at 49 U.S.C. §§ 11301(b) (1), 11709, & 11911. If a void security is issued, the carrier has civil liability for the issuance; this liability also extends to agents of the carrier who "participated in any way" in the issuance of the security. The remedy in a civil suit is either rescission or "the full amount of the damage sustained." See 49 U.S.C. § 11709 for the current version of the civil liability portion of the former 49 U.S.C. § 20a(11). Criminal liability, in contrast, is much narrower. The carrier's agent must "knowingly assent" to the improper issuance; this act is a misdemeanor, punishable by a fine of $1,000 to $10,000 and/or one to three years' imprisonment. See 49 U.S.C. § 11911 for the current version of the criminal liability portion of the former 49 U.S.C. § 20a(11)
 
 
 [15]
 Although this scheme may be comprehensive, it is not exclusive. See Dorfman v. First Boston Corp., 336 F.Supp. 1089, 1098-99 (E.D.Pa.1972) (holding that remedies under the Securities Act of 1933 would be available to purchasers of securities issued pursuant to section 20a). The overlapping jurisdiction of the ICC and the Securities and Exchange Commission is also reflected in the Railroad Revitalization and Regulatory Reform Act of 1976, § 308, 90 Stat. 56 (amending, Inter alia, 15 U.S.C. §§ 77c(a)(6), 77s(a), & 78m(b)). See generally E. Olson, Common Carriers: Regulation by the Securities (Sic ) Exchange Commission, 44 ICC Prac.J. 162 (1977)
 
 
 [16]
 In addition to the one year useful life limitation, the Commission also excluded purchase agreements "entered into for the sole purpose of acquiring motor carrier operating equipment." 348 I.C.C. at 319
 
 
 [17]
 The recent revision and codification of this portion of section 20a(2) currently provides for Commission approval of a carrier's "assumption of an obligation or a liability related to the securities of another person . . .." 49 U.S.C. § 11301(b)(1)
 
 
 [18]
 See note 3 Supra
 
 
 [19]
 Although the Commission originally intended to amend 49 C.F.R. § 1115.2(c), today, the language in this provision is the same as in 1971
 
 
 [20]
 See 49 C.F.R. § 1115.1 (1977). This form is currently labeled Form OP-F-200; at the time of the ICC decision referred to in the text, it was labeled Form BF-6
 
 
 [21]
 Order of June 12, 1972, Ex Parte No. 275, Expanded Definition of Term "Securities," Reprinted in Joint Appendix at 271
 
 
 [22]
 K. Davis, 1 Administrative Law Treatise § 5.03, at 299 (1958) provides the following definition of a "legislative" rule:
 A legislative rule is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body. In the clearest case of a legislative rule, a statute has conferred power upon the agency to issue the rule and the statute provides that the rule, if within the granted power, shall have the force of law.
 
 
 [23]
 See American President Lines v. Federal Maritime Commission, 114 U.S.App.D.C. 418, 316 F.2d 419 (1963); K. Davis, 1 Administrative Law Treatise § 5.05, at 315 (1958)
 
 
 [24]
 Joint Brief of the Interstate Commerce Commission and the United States at 33. Previously, the Commission had relied on section 20a(4) (currently implied in 49 U.S.C. § 10321; See note 9 Supra ), which authorizes the Commission to prescribe the forms which must be filed, as an implicit grant of authority to define "what instruments are to be subject to such filing requirements." 348 I.C.C. at 308. The Court makes no decision regarding the propriety of this interpretation
 
 
 [25]
 This appeal raises a case or controversy because "the issue tendered is purely a legal one" and the orders have a "sufficiently direct and immediate" impact on the petitioners. Abbott Laboratories v. Gardner, 387 U.S. 136, 149-152, 87 S.Ct. 1507, 1515 (1967). It is uncontested that if the 1975 Order were to go into effect, it would cost petitioner Greyhound Corp. $800,000 in filing fees alone to comply with the authorization of intercorporate advances. Joint Appendix at 394. Moreover, if any petitioner were to fail to comply with the statute, it would risk serious civil and criminal liability. See note 14 Supra and accompanying text
 
 
 [26]
 See notes 7 & 8 Supra, for the current version of this statutory language
 
 
 [27]
 See note 17 Supra, for the current version of this statutory language
 
 
 [28]
 Ejusdem generis may be translated literally as "of the same kind." Black's Law Dictionary 608 (Rev. 4th ed. 1968)
 
 
 [29]
 The current version of the statute, 49 U.S.C. § 11301(d)(1) (emphasis added), provides: "Before taking final action, the Commission must investigate the purpose and use of the securities Issue or assumption and the Proceeds from it."
 
 
 [30]
 In the business law sense, "issue" has been defined as "to put into circulation." Black's Law Dictionary 964 (Rev. 4th ed. 1968). The word "circulation" is strongly suggestive of the public tradability requirement discussed in part II E of this opinion
 
 
 [31]
 "Proceeds" may be defined as "money or articles or other thing of value arising or obtained by the sale of property." Black's Law Dictionary 1369 (Rev. 4th ed. 1968)
 
 
 [32]
 Section 20a(9)'s exemptions are currently codified at 49 U.S.C. § 11301(b)(2)
 
 
 [33]
 The current language of 49 U.S.C. § 11301(b)(2) provides an exemption for "notes issued by a carrier if the notes mature not more than (two) years after their date of issue and total (with all then outstanding notes having a maturity of not more than 2 years) not more than 5 percent of the par value of the then outstanding securities of that carrier."
 
 
 [34]
 Section 214 is currently codified at 49 U.S.C. § 11302
 
 
 [35]
 See note 32 Supra and accompanying text
 
 
 [36]
 See note 34 Supra and accompanying text
 
 
 [37]
 See note 17 Supra
 
 
 [38]
 Expanded Definition of Term "Securities," 344 I.C.C. 114, 119-120 (1973)
 
 
 [39]
 Joint Brief of the Interstate Commerce Commission and the United States at 21
 
 
 [40]
 Section 20a was originally enacted as § 439 of the Transportation Act of 1920, 41 Stat. 494. See note 4 Supra
 
 
 [41]
 In REA Express, Inc. v. Alabama Great S. R. R., 427 F.Supp. 1157 (S.D.N.Y.1976) (three-judge court), Aff'd mem. sub nom. Sowerwine v. United States, 431 U.S. 961, 97 S.Ct. 2914, 53 L.Ed.2d 1057 (1977), REA Express sued its former railroad owners asserting, among other things, that an account entitled "non-negotiable debt to affiliated companies advances" was void under § 20a for want of ICC authorization. The court held that this non-negotiable debt was valid and did not require ICC approval under § 20a(2). The court's reasoning was later adopted by the Second Circuit in REA Express, Inc. v. ICC, 550 F.2d 1342 (2d Cir. 1976) (per curiam)
 
 
 [42]
 Lehigh Valley R. R. Conditional Sale Contract, 233 I.C.C. 359, 362 (1939) (excluding conditional sale contracts from § 20a)
 
 
 [43]
 In United States v. New York, New Haven & Hartford R. R., 276 F.2d 525 (2d Cir. 1959), Cert. denied, 362 U.S. 961, 80 S.Ct. 877, 4 L.Ed.2d 876 (1960), the Government brought suit on behalf of the ICC alleging that changes in the terms of securities which had been previously approved and issued constituted an issuance of securities within the meaning of 20a. Significantly, the court rejected the Government's claim that these changes were "evidence of . . . indebtedness;" it stated, with apparent approval:
 (T)he Commission has held that an evidence of indebtedness is not within § 20a(2) unless it is in transferable form.
 276 F.2d at 530. In finding for the Government, the court relied instead on that portion of the statute requiring ICC approval "for any carrier to issue any share of capital stock." Id. The Second Circuit's decision reversed the holding of the district court, reported at 170 F.Supp. 562 (S.D.N.Y.1959).
 
 
 [44]
 See notes 22-24 Supra and accompanying text
 
 
 [45]
 See Watt Transport, Inc. Investigation of Practices, 338 I.C.C. 338 (1971) (§ 20a covers loan agreements totalling $1,070,000); Transcontinental Bus System, Inc., Notes, 80 M.C.C. 54 (1959) (§ 20a covers secured long term installment promissory notes); Davidson Transfer & Storage Securities, 271 I.C.C. 168 (1948) (§ 20a covers purchase money mortgage)
 
 
 [46]
 See Capital Transit Co. Securities, 40 M.C.C. 17 (1944) (§ 20a does not cover loan agreements totalling.$2.5 million); Hayes Freight Lines, Inc. Securities, 39 M.C.C. 577 (1939) (chattel mortgage outside the scope of § 20a); Illinois Terminal R. R., Consolidation, Acquisition, and Securities, 221 I.C.C. 676 (1937) (mortgage outside the scope of § 20a); Norfolk S. R. R. Receivers' Notes, 207 I.C.C. 121 (1935) (conditional sale agreement outside the scope § 20a); Notes of Lake Erie, Franklin and Clarion R. R., 99 I.C.C. 404 (1925) (equipment lease not covered by § 20a); Joint Brief of the Interstate Commerce Commission and the United States at 19
 
 
 [47]
 Section 439 of the Transportation Act of 1920, 41 Stat. 494, amended the Interstate Commerce Act by adding § 20a. See note 4 Supra
 
 
 [48]
 In an understatement, the Commission has noted, "While the legislative history of Section 20a makes numerous references to stocks, bonds and notes, there is a paucity of comment on the catch-all phrase 'other evidence of interest in or indebtedness of the carrier.' " Joint Brief of the Interstate Commerce Commission and the United States at 45
 
 
 [49]
 E. g., 59 Cong.Rec. 3330 (1920) (remarks of Sen. Robinson); 58 Cong.Rec. 8318 (1919) (remarks of Rep. Esch); Id. at 8310; See note 48 Supra
 
 
 [50]
 E. g., 58 Cong.Rec. 8318 (1919) (remarks of Rep. Esch); See note 48 Supra
 
 
 [51]
 The recently codified version of this statute, 49 U.S.C. § 11301(d)(1), provides that "the Commission must investigate the purpose and use of the securities issue or assumption and the proceeds from it."
 
 
 [52]
 The Court's selection of these two features as critical to its definition of a "security" within the meaning of § 20a is not intended to be all-inclusive. As more concrete situations develop, other factors may also come into play
 
 
 [53]
 See 59 Cong.Rec. 8376 (1919) (remarks of Rep. Rayburn) (quoted in text accompanying notes 49-50 Supra ); H.R.Rep. No. 456, 66th Cong., 1st Sess. 21 (1919) (the Esch Report) (quoted in text accompanying notes 48-49 Supra )
 
 
 [54]
 See note 51 Supra and accompanying text. Under the present codification, "securities" is no longer an informally used shorthand term, See note 3 Supra ; it has now been recognized as a formal term accompanied by a statutory definition. See 49 U.S.C. § 11301(a)(2)
 
 
 [55]
 Cf. SEC v. Diversified Industries, Inc., 465 F.Supp. 104 (D.D.C.1979) (discussing various tests employed to distinguish bona fide securities from other financial instruments)
 
 
 [56]
 The Supreme Court here quotes SEC v. W. J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Although its reference is specifically directed to the meaning of the phrase "investment contract" under § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1) (1976), the Court has indicated that this definition embodies a common thread running through all securities. See 439 U.S. at 558 n.11, 99 S.Ct. at 796 n.11, United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)
 Moreover, the Supreme Court's analysis in Daniel provides analogous support for the decision which this Court reaches. In Daniel, the plaintiff contended that a noncontributory, compulsory pension plan constituted an "investment contract" (and therefore a "security") within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. 439 U.S. at 553 - 557, 99 S.Ct. at 793-95. Although the plan at issue might have fallen within the vague language of the statutes, the Court applied a realistic analysis of congressional intent and held that such plans were not intended to be treated as securities. This Court has similarly applied a pragmatic and realistic approach to section 20a and concluded that many of the financial transactions enumerated in the Commission's 1975 Order fall outside the intended scope of the statute.
 
 
 [57]
 For example, because the Court is not presented with a concrete fact situation involving the amount of time needed for a note to be regarded as a security, See 15 U.S.C. §§ 77c(a)(3) & 78c(a)(10) (1976), it does not resolve the question of whether a carrier's note which lasts for a brief period of time may still be a security under § 20a. Other securities laws, however, may provide some guidance on the question of whether a note is a bona fide investment or merely a financing which arises out of a current transaction and the proceeds of which are to be used for current transactions
 
 
 [58]
 348 I.C.C. at 295
 
 
 [59]
 Section 20a(4), the former 49 U.S.C. § 20a(4), is now implied in 49 U.S.C. § 10321(a). See note 9 Supra
 
 
 [60]
 Form OP-F-200 appears at 354 I.C.C. at 22
 
 
 [61]
 Id. at 37
 
 
 [62]
 Joint Brief of the Interstate Commerce Commission and the United States at 38