## KANSAS PACIFIC RAILROAD COMPANY *v.* AT-CHISON, TOPEKA & SANTA FE RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

Argued November 4, 5, 1884.—Decided December 8, 1884.

Under the act of March 3, 1863, 12 Stat. 772, granting lands to Kansas to aid in the construction of railroads, no title could be acquired in any specific tracts as indemnity lands until actual selection ; and no selection could be made of lands appropriated by Congress to other purposes prior to the date of the selection.

Upon the admission of a Territory into the Union, corporations created under laws of the Territory become corporations of the State.

In judicial proceedings in courts of the United States to enforce contracts or rights of property, a corporation is regarded as a citizen of the State creating it.

This was a suit in equity brought up on appeal from an adverse decree of the Circuit Court in Kansas (see 2 McCrary, 550). The objects of the suit and the facts which make the case are set forth in the opinion of the court.

*Mr. J. P. Usher* for appellant.

*Mr. James Hagerman* and *Mr. J. H. McGowan* for appellee.

Mr. Justice Field delivered the opinion of the court.

The plaintiff and the defendant were incorporated by the Territorial Legislature of Kansas; and the question in controversy relates to land which they respectively claim under grants from the United States. The plaintiff's original name was the Leavenworth, Pawnee and Western Railroad Company, and it is thus termed in the act of Congress of 1862 creating the Union Pacific Railroad Company. After the Territory became a State that name was changed to the Union Pacific Railroad Company, Eastern Division, and the corpora-

tion was so called in subsequent legislation of Congress until some time in 1869, when it received its present designation.

The admission of Kansas as a State into the Union, and the consequent change of its form of government, in no respect affected the essential character of the corporations or their powers or rights. They must after that change be considered as corporations of the State, as much so as if they had derived their existence from its legislation. As its corporations they are to be treated, so far as may be necessary to enforce contracts or rights of property by or against them, as citizens within the clause of the Constitution declaring the extent of the judicial power of the United States. It has been expressly held that they are to be so considered when they have controversies with citizens of other States. And the same course of reasoning which led to this decision must also lead to the conclusion that in all cases where a federal court can take jurisdiction of controversies between citizens, whether of different States or of the same State, it will take jurisdiction of like controversies between corporations, and treat them as citizens of the State under whose laws they were created or continue to exist.

The Constitution declares that the judicial power of the United States shall extend to all cases in law and equity arising under it, the laws of the United States, and treaties made under their authority. The act of March 3, 1875, 18 Stat. 470, invests the Circuit Court with original cognizance, concurrent with the courts of the several States, " of all suits of a civil nature at common law or in equity " thus arising, where the matter in dispute exceeds, exclusive of costs, the sum or value of $500. The reasons for granting this jurisdiction, and for investing it in the Circuit Courts, are as applicable where the controversies are between citizens united under a corporate name, as where they are between citizens in their individual capacity. A private corporation is, in fact, but an association of individuals united for a lawful purpose and permitted to use a common name in their business, and to have a change of members without dissolution. As said by Chief Justice Marshall in *Providence Bank* v. *Billings*, 4 Pet. 514, at p. 562:

" The grant of incorporation is to bestow the character and properties of individuality on a collective and changing body of men."

The controversy in this case arises upon laws of the United States. As far back as *Cohens* v. *Virginia*, 6 Wheat. 264, 379, decided more than sixty years ago, it was said that a case may be considered to arise under the Constitution or a law of the United States whenever its correct decision depends upon the construction of either. The same thing is expressed by the statement that a case arises under the Constitution or laws of the United States whenever the rights set up by a party may be defeated by one construction or sustained by the opposite construction. *Osborne* v. *Bank of the United States*, 9 Wheat. 738. Here both corporations claim title to the same land in Kansas under different acts of Congress, and the decision depends upon the construction given to those acts. It is, therefore, clear that the court below had jurisdiction of the subject of the suit and of the parties.

The plaintiff claims under the act of July 1, 1862, 12 Stat. 489, to aid the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and acts amending or supplementing it. That act granted to the company formed under its provisions, for every mile of the road, five sections of public land designated by odd numbers on each side of the line of the road within the limit of ten miles, which were not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim had not attached at the time the line was definitely fixed. It also provided that whenever the company had completed forty consecutive miles of any portion of the road and telegraph line, and supplied all necessary equipments and appurtenances of a first-class road, the President of the United States should appoint three commissioners to examine the same, and if they reported that the road and telegraph line had been constructed and equipped in all respects as required, patents were to issue for the adjacent lands. An examination was to be had, as each successive section of forty miles was completed, and, upon a favorable report of the commissioners, other similar patents were to

issue.  Within one year after its passage the company was required to file in the Department of the Interior its assent to the act, and within two years afterwards to designate the general route of its road as near as might be, and to file a map of the same in that department.  The Secretary of the Interior was then to withdraw the lands within fifteen miles of the designated route from pre-emption, private entry, and sale, and when any portion of the road was finally located he was to cause the lands granted to be surveyed and set off as fast as necessary for the purposes mentioned.

On the 2d of July, 1864, an amendatory act was passed doubling the grant, and extending the limits within which the lands were to be withdrawn to twenty-five miles, but declaring that neither act should defeat or impair any pre-emption, homestead, swamp-land or other lawful claim, nor include any government reservation or mineral lands.  13 Stat. 356.  It contained no express words of new and additional grant, but provided that the numbers in the act of 1862 should be stricken out and larger numbers inserted in lieu thereof.  Thenceforth the act of 1862 is to be read as against the United States and all parties not having acquired in the mean time paramount rights, as though the substituted numbers were originally inserted therein.  *Missouri, Kansas & Texas Railroad Co.* v. *Kansas Pacific Railroad Co.,* 97 U. S. 491, 497 ; *United States* v. *Burlington, &c., Railroad Co.,* 98 U. S. 334.  The title to the increased quantity of land must, with the exceptions mentioned, therefore, be deemed to have passed to the grantee at the date of the original act.

That act contemplated the connection of several branch roads with the main line, one of which the plaintiff was to construct.  It directed the President to designate the initial point of that line in Nebraska, on the 100th meridian west from Greenwich, at which the eastern branches were to unite, and authorized the plaintiff to construct a railroad and telegraph line from the Missouri River at the mouth of the Kansas River at the south side thereof, so as to connect with the Pacific road of Missouri at that point.  In case the general route of the main line was located so as to require a departure northerly

from the proposed Kansas road before it reached that meridian, the location of that road was to conform to it. The route in Kansas west of the meridian of Fort Riley to the initial point mentioned was to be subject to the approval of the President after actual survey.

The amendatory act of 1864 enlarged the grants made to all the branches of the main road. As was said by this court, in *United States* v. *Burlington, &c., Railroad Co.* 98 U. S. 341: " All the reasons which led to the enlargement of the original grant led to its enlargement to the branches. It was the intention of Congress, both in the original and in the amendatory act, to place the Union Pacific Company, and all its branch companies, upon the same footing as to lands, privileges, and duties, to the extent of their respective roads, except when it was otherwise especially stated. Such has been the uniform construction given to the acts by all departments of the government. Patents have been issued, bonds given, mortgages executed, and legislation had upon this construction. This uniform action is as potential, and as conclusive of the soundness of the construction, as if it had been declared by judicial decision. It cannot at this day be called in question."

On the 3d of July, 1866, Congress passed an act enabling the plaintiff to designate the general route of its road, and to file a map thereof at any time before the 1st of December, 1866, and providing that after the filing of the map the lands along its entire line, so far as it was designated, should be reserved from sale by the Secretary of the Interior. It also provided that the company should connect its line of road and telegraph with the Union Pacific road at a point not more than fifty miles westerly from the meridian of Denver, in Colorado.

It is conceded that the plaintiff in due time filed in the Department of the Interior its acceptance of the acts of 1862 and 1864, commenced the construction of its road under them, completed it within the required time, and complied with the terms and conditions essential to entitle it to the lands granted; that on the 10th of January, 1866, it filed with the Secretary of the Interior a map of the definite location of its road, showing the dates of the actual location of its various parts in com-

pliance with his instructions; that the road was located along and contiguous to the lands in controversy before February 4, 1865; that upon that location the road was afterwards duly constructed; that on February 6, 1866, the location was approved by the Commissioner of the General Land Office; that by instructions soon afterwards given the odd-numbered sections of land within twenty miles of the road were withdrawn from sale and reserved for its use; that the railroad along and adjacent to the lands in controversy was completed and accepted by the President before December 14, 1866, and by his order the Secretary of the Interior was directed to issue patents to the plaintiff for the adjacent lands under the grant; that the lands in controversy in this case are odd sections within twenty miles of the line of the railroad as thus constructed and accepted, and were public lands July 1, 1862, and have not since been entered under any pre-emption or homestead law or otherwise reserved or disposed of by the United States, unless they are embraced in a grant to the State of Kansas by virtue of an act of Congress of March 3, 1863, 12 Stat. 772, under which the defendant claims. If not thus embraced the title of the plaintiff to them is clear.

By that act Congress granted lands to the State of Kansas for the purpose of aiding in the construction of various railroads, one of which was to extend from the city of Atchison via Topeka, the capital of that State, to its western line in the direction of Fort Union and Santa Fé, New Mexico, with a branch down the Neosho Valley to a point where the Leavenworth and Lawrence road entered it. The lands were the alternate sections designated by odd numbers for ten sections in width on each side of the proposed road. The grant was accompanied with a proviso that in case it should appear when the lines or routes of the road should be definitely fixed that the United States had sold any section granted or any part thereof, or that the right of pre-emption or homestead settlement had attached to it, or that it had been reserved by the United States for any purpose whatever, then it should be the duty of the Secretary of the Interior to select from the public lands, nearest to the tiers of sections specified, an equal amount

of land in alternate sections or parts of sections, designated by odd numbers, not previously sold, reserved, or otherwise appropriated, to be held by the State of Kansas for the like uses and purposes. The legislature of the State, by an act passed February 9, 1864, accepted the grant from the United States, and, in consideration that the Atchison, Topeka and Santa Fé Railroad Company would construct the road mentioned, directed the governor of the State, whenever any twenty consecutive miles were completed, to convey to that company by patent the lands granted by Congress' to aid in its construction, to be selected opposite to and within the limit of ten miles of the road. On the 16th of the same month the company accepted the provisions of this act and filed its acceptance with the Secretary of State. On the 19th of March following, before any route of the road had been designated by the company or any map of it filed, the Commissioner of the General Land Office made an order withdrawing from private sale or location, and from pre-emption or homestead entry, all the public lands lying within ten miles of lines marked by him on a diagram as "the probable lines" of the road and its branches. This order was made at the request of Senators and Representatives in Congress from Kansas, and was approved by the Secretary of the Interior. On the 1st of January, 1866, the company filed in the Department of the Interior a map or profile of its road from Topeka to Emporia, adjacent to which and within twenty miles thereof are the lands in controversy. It is conceded that afterwards the road was constructed in full compliance with the act of Congress and the act of the State of Kansas, and that it was duly approved and accepted by the proper authorities. When its line was definitely fixed it appeared that of the lands lying within the limits of ten miles thereof, many sections and parts of sections had been sold by the United States, and to many the right of pre-emption and homestead settlement had attached, and that some had been reserved by the United States for other purposes, thus greatly diminishing the quantity which would otherwise be covered by the grant. To make up the deficiency the Secretary of the Interior selected the lands in controversy, taking them from

alternate sections designated by odd numbers, nearest the tiers of sections within the ten-mile limit, but outside of that limit and within twenty miles of the road. These indemnity lands were certified to the State by the land department against the objections of the plaintiff, and the proper officers of the State in May, 1873, executed a patent of them to the company.

The question, therefore, for determination is, whether the grant to Kansas, by the act of Congress of March 3, 1863, covered the title to these indemnity lands. We are clear that it did not. It granted only alternate sections, designated by odd numbers, within the limit of ten miles, and from them certain portions were to be excepted. For what was thus excepted other lands were to be selected from adjacent lands, if any then remained, to which no other valid claims had originated. But what unappropriated lands would thus be found and selected could not be known before actual selection. A right to select them within certain limits, in case of deficiency within with the ten-mile limit, was alone conferred, not a right to any specific land or lands capable of identification by any principles of law or rules of measurement. Neither locality nor quantity is given from which such lands could be ascertained. If, therefore, when such selection was to be made, the lands from which the deficiency was to be supplied had been appropriated by Congress to other purposes, the right of selection became a barren right, for until selection was made the title remained in the government, subject to its disposal at its pleasure. The grant to the Kansas Pacific Company, by the act of 1862, carried the odd sections within the limit of ten miles from its road, and by the act of 1864 such sections within the limit of twenty miles. The act of 1862 is to be construed, as already said, as though the larger number were originally inserted in it, and, with the exceptions stated, it must be held to pass the title to the grantee as against the United States, and against all persons not having acquired that title previous to the amendment. The grant to Kansas, as stated, conferred only a right to select lands beyond ten miles from the defendant's road, upon certain contingencies. It gave no title to indemnity lands in advance of their selection.

By the very terms of the grant to Kansas, as we have seen, there was excepted from it any sections or parts thereof which the United States had sold or reserved for any purpose, or to which a pre-emption or homestead settlement had attached before the line of the road or its branches had been definitely fixed. And the Secretary was required to select, for like purposes, outside of the limits of the grant, as much lands, says the act, " as shall be equal to such lands as ·the United States have sold, reserved, or *otherwise appropriated*, or to which the rights of pre-emption or homestead settlements have attached as aforesaid." The reservation "for any purpose" is thus made to cover not merely a specific reservation in terms for the uses of the United States, but any appropriation of the lands by the government.

The line of the road of the Atchison, Topeka and Santa Fé Company was not definitely fixed until 1866. Until then the appropriation of lands, even within the limits of the grant, much less so of lands without them, was in no respect an impairment of its rights. The appropriation outside of those limits only lessened the number of sections from which the Secretary might under certain contingencies have the right to select indemnity lands; it had no other effect. The order of withdrawal of lands along the " probable lines" of the defendant's road made on the 19th of March, 1863, by the Commissioner of the General Land Office, affected no rights which without it would have been acquired to the lands, nor in any respect controlled the subsequent grant. And besides, it only purported to apply to lands within the ten-mile limit, and the lands in controversy lie outside of it, although the court below, overlooking the stipulation of the parties, stated the fact to be otherwise, an error which probably misled it to its conclusion.

It follows from the views expressed that the plaintiff, the Kansas Pacific Railway Company, under the acts of Congress of 1862 and 1864, by a compliance with all their provisions in the construction of its road, acquired the title to the lands in controversy, and has accordingly a right to record evidence of it in the form of a patent.

*The decree of the court below is reversed and the case remanded, with directions to enter a decree adjudging that the title to the lands in controversy passed to the plaintiff under the acts of Congress of 1862 and 1864; and that the defendant execute to the plaintiff a conveyance of its claim and interest therein.*