**SANTA FE PACIFIC RAILROAD COMPANY, et al., Appellants,**

v.

**SECRETARY OF the INTERIOR.**

**No. 84–5440.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 29, 1985.

Decided Oct. 9, 1987.

Richmond F. Allan, with whom Edward Weinberg, Washington, D.C., was on brief, for appellants.

John A. Bryson, Atty., Dept. of Justice, with whom Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., was on brief, for appellee.

Before ROBINSON, and GINSBURG, Circuit Judges, and WEIGEL*, Senior District Judge.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Department of the Interior denied an application by Santa Fe Pacific Railroad Company (Santa Fe) for a patent covering 14,632.72 acres of land in Arizona.[1] This ruling was upheld by the District Court[2] and Santa Fe appeals. We find that the Department and the District Court misconstrued a provision of a 1955 statute known as the Recordation Act,[3] which required the registration of certain unperfected rights to land. We accordingly reverse.

---

* Of the United States District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(a) (1982).

1. *Santa Fe Pac. R.R.,* No. 82–449, 72 IBLA 197 (Interior Bd. of Land App. Apr. 19, 1983) (decision) [hereinafter *IBLA Decision* ], Appendix for Appellant (A.App.) II–4.

2. *Santa Fe Pac. R.R. v. Secretary of Interior,* 587 F.Supp. 748 (D.D.C.1984).

3. Act of Aug 5, 1955, ch. 573, 69 Stat. 534 (reproduced in note following 43 U.S.C. § 274 (1982)).

## I. Background

In order to "secure the safe and speedy transportation of the mails, troops, munitions of war, and the public stores"[4] to the West, Congress passed a series of statutes in the mid-nineteenth century giving railroad companies rights to public land adjacent to their lines.[5] One such statute, typical of efforts to attract westward development by land grants, was enacted in 1866.[6] This statute incorporated the Atlantic and Pacific Railroad Company (A & P), the predecessor of Santa Fe,[7] and bestowed upon it a right of way to construct a railroad and telegraph line along a route of its choosing from Springfield, Missouri, to the Pacific coast.[8] The statute also created two strips of territorial land, one on each side of the line, and gave A & P "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile."[9] The boundaries of grants of this kind have come to be known as "place limits," and in exchange for this land Congress reserved the use of the line for the benefit of the United States on whatever terms it saw fit to impose.[10]

Congress recognized, however, that in some instances earlier rights, such as homestead claims, would prevail over the railroad's interest in place lands. The statute thus conferred a right of substitution in those situations, providing that "other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior," from an additional area of public land bounded by what are

---

4. Act of July 27, 1866, ch. 278, § 3, 14 Stat. 292, 294.

5. See, e.g., Act of Mar. 3, 1871, ch. 122, 16 Stat. 573; Act of May 4, 1870, ch. 69, 16 Stat. 94; Act of July 27, 1866, ch. 278, 14 Stat. 292; Act of July 26, 1866, ch. 270, 14 Stat. 289; Act of July 25, 1866, ch. 242, 14 Stat. 239; Act of July 2, 1864, ch. 217, 13 Stat. 365. A complete list of these statutes appears in General Land Office, Department of the Interior, *Statement Showing Land Grants Made by Congress to Aid in the Construction of Railroads, Wagon Roads, Canals, and Internal Improvements, Together with Data Relative Thereto, Compiled from the Records of the General Land Office* (1915) [hereinafter Statement], reproduced as app. A to Memoranda in Support of Plaintiff's Motion for Summary Judgment, *Santa Fe Pac. R.R. v. Secretary of Interior,* Civ. No. 83-1939 (D.D.C.) (filed Dec. 15, 1983), Record Document (R.Doc.) 10. This publication lists 82 statutes totaling 158,293,376.84 acres in grants.

6. Act of July 27, 1866, ch. 278, 14 Stat. 292.

7. Santa Fe succeeded to the interests of the Atlantic and Pacific Railroad pursuant to the Act of Mar. 3, 1897, ch. 374, 29 Stat. 622.

8. Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292, 294.

9. *Id.* § 3, 14 Stat. 292, 294–295. The strips were half this area in the states. *Id.* The text of § 3 reads in pertinent part:

   SEC. 3. *And be it further enacted,* That there be, and hereby is, granted to the Atlantic and Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway and its branches, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections, and not including the reserved numbers.

10. *Id.* § 11, 14 Stat. 292, 297 (permitting Congress to restrict charges for Government transportation); see also Act of June 7, 1924, tit. 1, ch. 291, 43 Stat. 477, 486 (fixing rates of carriage for Army transportation over "any railroad which under land-grant Acts was aided in its construction by a grant of land on condition that said railroad shall be and remain a public highway for the use of the United States"); Act of Mar. 3, 1875, ch. 133, 18 Stat. 452, 453–454 (providing for transport of Army personnel and property at no charge).

known as "indemnity limits"—two additional strips, each ten miles wide, adjoining the place-limit strips.[11] Thus, to the extent that any deficiency in land within the place limits remained in consequence of superior rights, land within the indemnity limits was to be made available to A & P.[12]

In 1872, A & P filed a plat with the Secretary of the Interior designating the location of its line, thereby establishing its right to place land.[13] Because preexisting claims took precedence over some of the place land, A & P, in 1887, chose 1,244,160 acres of indemnity land. The selection was rejected, however, because the Department of the Interior had not surveyed the land within the indemnity limits, which, according to the Department, rendered it "not subject to selection" at that time.[14] Nonetheless, A & P began to contract with other parties to sell its interests in land granted to it by the 1866 Act. One such transaction ripened into a sale of 21,488 acres within Yavapai County, Arizona, within the indemnity limits—the land now in dispute—to the predecessors of Perrin Properties, Inc.,[15] which was consummated by a deed duly recorded in Arizona.[16] Ten years later, this land was included in Prescott National Forest.[17]

In 1914, Perrin petitioned the Department for an order compelling Santa Fe, the successor to A & P, to select the indemnity lands that had been sold to Perrin's predecessors in compliance with the terms of the 1896 contract of sale.[18] The Department, noting in passing that some of this land still had not been surveyed, ruled that it had no jurisdiction to adjudge a contract dispute between private parties.[19]

No further legal activity by the parties occurred prior to 1940, when Congress passed the Transportation Act[20] to alleviate the growing burden on railroads from supplying the Government with transportation at below-market rates.[21] This legislation allowed railroads that had received land grants from the Government to aid in the construction of their lines to charge the Government full commercial rates, on the condition that the railroads released any claim against the Government arising under railroad-construction acts.[22] The Act stated specifically, however, that it was not to be construed to "prevent the issuance of patents confirming the title to such lands as the Secretary of the Interior shall find have been heretofore sold by any such carrier to an innocent purchaser for value."[23]

11. Act of July 27, 1866, ch. 278, § 3, 14 Stat. 292, 295.

12. Indemnity land, like place land, was to be selected "in alternate sections, and designated by odd numbers." *Id.*

13. See, e.g., *United States v. Southern Pac. R.R.,* 146 U.S. 570, 595, 13 S.Ct. 152, 156, 36 L.Ed. 1091, 1097 (1892); *St. Paul & Pac. R.R. v. Northern Pac. R.R.,* 139 U.S. 1, 5, 11 S.Ct. 389, 390, 35 L.Ed. 77, 79 (1891); *Chapman v. Santa Fe Pac. R.R.,* 90 U.S.App.D.C. 34, 35, 198 F.2d 498, 499 (1951), *cert. denied,* 343 U.S. 964, 72 S.Ct. 1058, 96 L.Ed. 1361 (1952); *IBLA Decision, supra* note 1, 72 IBLA at 199, A.App. II–6.

14. *IBLA Decision, supra* note 1, 72 IBLA at 199, A.App. at II–6. The Department's practice of withholding unsurveyed land from selection has been upheld. See *United States v. Northern Pac. R.R.,* 311 U.S. 317, 344, 61 S.Ct. 264, 276–277, 85 L.Ed. 210, 227 (1940); *Chapman v. Santa Fe Pac. R.R., supra* note 13, 90 U.S.App.D.C. at 37, 198 F.2d at 501.

15. The land was originally conveyed to E.B. Perrin, Lilo M. Perrin and Robert Perrin. Title

has since passed on to Perrin Properties, Inc. See *IBLA Decision, supra* note 1, 72 IBLA at 199, A.App. II–6.

16. *Id.* The deed is reproduced as Administrative Record Document (Admin.R.Doc.) 1–J.

17. Presidential Proclamation of November 26, 1907, *reprinted in* 35 Stat. 2162 (1907).

18. See *Perrin v. Santa Fe Pac. R.R.,* 43 Pub. Lands Dec. 467 (1914).

19. *Id.* at 468–470.

20. Transportation Act of 1940, ch. 722, § 321, 54 Stat. 898, 954 (codified as amended at 49 U.S.C. § 10721(a)(2) (1982)).

21. See *Krug v. Santa Fe Pac. R.R.,* 329 U.S. 591, 593, 67 S.Ct. 540, 541, 91 L.Ed. 527, 529 (1974).

22. Transportation Act of 1940, ch. 722, § 321, 54 Stat. 898, 954.

23. *Id.* § 321, 54 Stat. 898, 954–955.

Santa Fe took advantage of this statute by filing a release of its claims.[24] As required by the Department's regulations, Santa Fe listed all of its sales to innocent purchasers for value, including the 1896 deed to predecessors of Perrin.[25] The Department accepted and approved both the release and the list.[26]

Yet another hiatus in the activities of the parties, this one lasting 28 years, followed the filing of the release. During the interim, in 1955, Congress passed the 1955 Recordation Act, which required reporting within two years of certain unperfected claims to land, including "lieu selection ... right[s]." [27] The land sold to Perrin's predecessors was not registered under the Act.

In 1969, Perrin asked for a cash payment from the Department for the land in issue.[28] The Bureau of Land Management's rejection of this request was affirmed in 1973 by the Interior Board of Land Appeals on the ground that any selection right A & P and Santa Fe successively had with respect to indemnity land terminated when the release was filed by Santa Fe under the 1940 Act.[29] By the Department's reasoning, Perrin was not an innocent purchaser within the meaning of that Act because its predecessor in interest had not purchased title to the land but merely an inchoate right to acquire land,[30] and the release Santa Fe filed in 1940 extinguished the right asserted by Perrin.[31]

In 1977, Santa Fe applied for a patent to the land claimed by Perrin.[32] The Bureau denied the application for the same reason it had disapproved the cash payment requested by Perrin in 1969.[33] The Board added, however, that Santa Fe's right to indemnity land would have vested had such lands been sufficient to make up for the shortfall in place lands, and would not have been affected by the 1940 release filing.[34]

Santa Fe appealed to the Board of Land Appeals, which rejected the Bureau's ruling that Santa Fe's right to the land had been forfeited by the 1940 release of claims. The Board held instead that there had been a deficiency in the indemnity lands to make up for losses in place lands, that the right to the land in controversy had vested, and that this right had been conveyed to Perrin's predecessors in title.[35] The Board denied the application for a patent, however, because Perrin's claim had not been reported pursuant to the Recordation Act.[36]

Santa Fe sought review of this decision in the District Court,[37] which affirmed both the result and the reasoning of the Board.[38] An appeal was then taken to this court.

## II. NATURE OF APPELLANT'S PROPERTY RIGHT

The parties agree that Santa Fe's interest in the land in suit vested, and that

**24.** This release is partially reproduced in *Krug v. Santa Fe Pac. R.R., supra* note 21, 329 U.S. at 595 n. 9, 67 S.Ct. at 542 n. 9, 91 L.Ed. at 530 n. 9.

**25.** *IBLA Decision, supra* note 1, 72 IBLA at 199, A.App. II–6. The list of lands released is reproduced as Exhibit B to Application for Patent, Santa Fe Pac. R.R., No. A–10158 (Arizona Land Office) (filed Sept. 6, 1977) [hereinafter Patent Application], Admin.R.Doc. 1–N.

**26.** See Notice of Releases, 6 Fed.Reg. 2634–2635 (1941).

**27.** Act of Aug. 5, 1955, ch. 573, § 1, 69 Stat. 534, 535.

**28.** See *IBLA Decision, supra* note 1, 72 IBLA at 200, A.App. II–7.

**29.** *Id.;* see notes 20–26 *supra* and accompanying text.

**30.** *IBLA Decision, supra* note 1, 72 IBLA at 200, A.App. II–7.

**31.** *Id.*

**32.** Patent Application, *supra* note 25.

**33.** *IBLA Decision, supra* note 1, 72 IBLA at 210, A.App. II–17.

**34.** *Id.* at 201, A.App. II–8.

**35.** *Id.* at 203, 210, A.App. II–10, 17.

**36.** *Id.* at 208, A.App. II–15.

**37.** Jurisdiction lay in the District Court under 28 U.S.C. §§ 1331(a), 1361 (1982).

**38.** *Santa Fe Pac. R.R. v. Secretary of Interior, supra* note 2.

Perrin was an innocent purchaser for value within the meaning of the 1940 Act. Consequently, the only question before us is whether that interest fell within the purview of the Recordation Act. If the property involved here is encompassed by the Recordation Act, it has been extinguished by the failure to register the claim with the Department. Before examining the Recordation Act itself, however, we briefly examine the nature of the interest asserted by Perrin and the manner in which it arose.

The 1866 Act granted A & P the right to select land within the place limits. The right attached automatically to land within a given distance from the track, and the Supreme Court has several times held that no selection was essential to acquisition of title.[39] If there was a deficiency in land within the place limits because of preexisting rights, a selection from land within the indemnity limits ordinarily would become necessary.[40] But the courts have on several occasions ruled that if the land within the indemnity limits was itself insufficient to make up for deficiencies in place land, no selection was necessary, since all land within those limits had to be used to make up the losses in place land.[41] These cases clearly hold that a right attaches to "specific land within the indemnity limits" without any need for selection.[42]

This principle was applied in favor of Santa Fe in earlier litigation before this court involving different indemnity lands. In *Chapman v. Santa Fe Pacific Railroad*,[43] the Aztec Land and Cattle Company had bought 98,690.83 acres of land within an indemnity belt from A & P. Santa Fe's release under the Transportation Act of 1940 listed Aztec as an innocent purchaser for value.[44] When Santa Fe made selections, they were turned down by the Department on the ground that "the land had not been ascertained and identified."[45] According to the Department, Santa Fe had not acquired any interest in specific land which it could convey prior to filing of its release.[46]

**39.** E.g., *United States v. Southern Pac. R.R., supra* note 13, 146 U.S. at 594–595, 13 S.Ct. at 155–156, 36 L.Ed. at 1097–1098; *St. Paul & Pac. R.R. v. Northern Pac. R.R., supra* note 13, 139 U.S. at 5, 11 S.Ct. at 390, 35 L.Ed. at 79; *Ryan v. Railroad Co.,* 99 U.S. (9 Otto) 382, 386, 25 L.Ed. 305, 305 (1878).

**40.** *New Orleans Pac. Ry. v. Parker,* 143 U.S. 42, 57–58, 12 S.Ct. 364, 369, 36 L.Ed. 66, 70 (1892); *Barney v. Winona & St. Peter R.R.,* 117 U.S. 228, 232, 6 S.Ct. 654, 656, 29 L.Ed. 858, 860 (1886); *Kansas Pac. R.R. v. Atchison, T. & S.F. R.R.,* 112 U.S. 414, 421, 5 S.Ct. 208, 212, 28 L.Ed. 794, 797 (1884); *Grinnell v. Railroad Co.,* 103 U.S. (13 Otto) 739, 742, 26 L.Ed. 456, 457–458 (1880).

**41.** See *United States v. Northern Pac. Ry.,* 256 U.S. 51, 65–66, 41 S.Ct. 439, 442, 65 L.Ed. 825, 829 (1921) ("[w]hile it often has been said that under [a railroad construction] grant no right attaches to any specific land within the indemnity limits until it is selected, an examination of the cases will show that this general rule never has been applied as between the Government and the grantee where the lands available for indemnity were not sufficient for the purpose"); *United States v. Colton Marble & Lime Co.,* 146 U.S. 615, 616, 13 S.Ct. 163, 164, 36 L.Ed. 1104, 1105 (1892); *St. Paul & Pac. R.R. v. Northern Pac. R.R., supra* note 13, 139 U.S. at 19, 11 S.Ct. at 395, 35 L.Ed. at 84; see also *Chapman v. Santa Fe Pac. R.R., supra* note 13, 90 U.S.App. D.C. at 37, 198 F.2d at 501; *Krug v. Santa Fe Pac. R.R.,* 81 U.S.App.D.C. 288, 291, 158 F.2d

317, 320 (1946), *rev'd on other grounds, Krug v. Santa Fe Pac. R.R., supra* note 21.

The rationale for such a rule was clearly explained in *St. Paul & Pac. R.R. v. Northern Pac. R.R., supra* note 13, 139 U.S. at 19, 11 S.Ct. at 395, 35 L.Ed. at 84:

> As to the objection that no evidence was produced of any selection by the Secretary of the Interior from the indemnity lands to make up for the deficiencies found in the lands within the place limits, it is sufficient to observe that all the lands within the indemnity limits only made up in part for these deficiencies. There was, therefore, no occasion for the exercise of the judgment of the Secretary in selecting from them, for they were all appropriated.

**42.** *United States v. Northern Pac. Ry., supra* note 41, 256 U.S. at 65, 41 S.Ct. at 442, 65 L.Ed. at 829. This the Department itself apparently recognizes. See *IBLA Decision, supra* note 1, 72 IBLA at 203, A.App. II–10 ("no selection by Santa Fe was necessary to vest title in it").

**43.** *Supra* note 13.

**44.** See notes 20–26 *supra* and accompanying text.

**45.** *Chapman v. Santa Fe Pac. R.R., supra* note 13, 90 U.S. App.D.C. at 37, 198 F.2d at 500.

**46.** See *id.* at 36–37, 198 F.2d at 499–500. This was essentially the same reasoning adopted by

On appeal, this court soundly rejected the Department's position. Constrained by the Supreme Court's holdings that no selection was necessary to vest the railroad's interest in indemnity land when such land did not fully satisfy losses in place land,[47] the court held that "Santa Fe did have a right which it could ... sell," [48] and that Aztec as its grantee, was protected by the saving clause of the Transportation Act.[49]

While the caselaw makes clear that no selection is needed under these circumstances, it is much less lucid in regard to exactly what sort of interest vested. The *Chapman* court, while characterizing the interest as less than "title," described it as a vested "right to choose or select lands." [50] The Department insists that because the 1866 Act contemplated selections from the indemnity belt "in lieu" [51] of lands unavailable within the place limits, the right is a "lieu selection ... right." [52] The Department asks us to look to the historical nature of the interest, arguing that if, in its inception, the right involved selection, it is forever a selection right, regardless of how ultimately it is exercised and that such rights are therefore covered by the Recordation Act.[53] Santa Fe, in contrast, prefers to assess the interest that Perrin actually obtained. It contends that since, in accord with precedent,[54] no selection was

ever needed, Perrin's interest did not fit within the Recordation Act's catchall phrase "lieu selection ... right," and thus was not subject to the requirement of registration.[55] Santa Fe notes that as soon as it appeared that the amount of indemnity land was too small to compensate for the losses in place land, an interest in all land remaining within the indemnity limits vested; and asserts that since no selection was required, the interest held by Perrin could not have been a "lieu selection ... right." [56] In Santa Fe's estimation, the Recordation Act's catchall phrase simply did not embrace the interest held by Perrin.[57]

The expression "lieu selection ... right" obviously is not common. Standing alone, it does not afford a basis for choosing between the two opposing views of its tenor. Since the meaning Congress intended for this critical term is not apparent from the language itself, we search the statutory context of the catchall provision, its purpose and its legislative history for helpful clues.[58]

### III. THE RECORDATION ACT

#### A. *Statutory Context and Purpose*

■ Section 1 of the Recordation Act provides as follows:

the Bureau of Land Management in the instant case prior to its reconsideration by the Board of Land Appeals. See notes 32–36 *supra* and accompanying text.

47. See *Chapman v. Santa Fe Pac. R.R., supra* note 13, 90 U.S.App.D.C. at 37–38, 198 F.2d at 500–501 (discussing *United States v. Northern Pac. Ry., supra* note 41).

48. 90 U.S.App.D.C. at 37, 198 F.2d at 501.

49. *Id.* at 36–38, 198 F.2d at 500–502. Santa Fe was under a legal obligation to Aztec to select the lands involved for Aztec, and the latter qualified as an "innocent purchaser for value" under the Transportation Act. *Id.* at 38, 198 F.2d at 502.

50. *Id.* at 37, 198 F.2d at 501.

51. Act of July 27, 1866, ch. 278, § 3, 14 Stat. 292, 294–295, reproduced in pertinent part *supra* note 9.

52. Brief for Appellee at 12.

53. *Id.* at 12–13.

54. See notes 41–49 *supra* and accompanying text.

55. Brief for Appellant at 22.

56. *Id.* at 17–24.

57. *Id.* at 24–40.

58. See *Norwegian Nitrogen Prods. Co. v. United States,* 288 U.S. 294, 317, 53 S.Ct. 350, 359, 77 L.Ed. 796, 808 (1933) (commending "recourse to all the aids available in the process of construction, to history and analogy and practice as well as to the dictionary"); see also *Blum v. Stenson,* 465 U.S. 886, 896–897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891, 900 (1984); *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80, 88 (1981); *Train v. Colorado Pub. Interest Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434, 441 (1976); *National Treasury Employees Union v. Federal Labor Relations Auth.,* 223 U.S.App.D.C. 364, 370, 691 F.2d 553, 559 (1982).

[A]ny owner of, and any person claiming rights to, Valentine scrip ...; Sioux Half-Breed scrip ...; Supreme Court scrip ...; Surveyor-General scrip ...; a soldier's additional homestead right ...; a forest lieu selection right ...; a lieu selection right conferred by the Act of July 1, 1898 ...; a bounty land warrant ...; *or any lieu selection or scrip right* or bounty land warrant, or right in the nature of scrip issued under any Act of Congress not enumerated herein (except the indemnity selection rights of any State, or the Territory of Alaska), shall, within two years from the effective date of this Act, present his holdings or claim for recordation by the Department of the Interior.[59]

Thus, after identifying eight land-grant statutes to which it specifically applies, the Act extends its requirement to "any lieu selection ... right" as a catchall provision.

When, as here, a general term follows specific terms, the rule of *ejusdem generis* provides an aid to interpretation. "Ordinarily, it limits general terms which follow specific ones to matters similar to those specified."[60] In the present case, this rule suggests that the catchall provision should be read to include only rights similar in character to those conferred by the statutes enumerated. Without exception, the statutes referenced pertained to scrip, warrants, and other indicia of land rights issued as compensation to individuals for a variety of reasons. In each case, however, the rights attested to were not attached to land in any particular location; rather, they were entitlements to select from public lands much more generally.[61]

■ *Santa Fe* argues that since the statutes listed in the Recordation Act involved "floating selection rights unattached to particular land," the catchall phrase could not include rights, such as Perrin's that were confined in their exercise by specific indemnity limits.[62] The Department counters with the observation that the statutes referred to were similar to the 1866 Act in that they all provided for selections from public lands in lieu of something else;[63] therefore the Recordation Act did encompass rights such as Perrin's. The issue, then, is which of these readings is the more acceptable.

We begin our quest for the answer by reviewing the overall purpose of the Recordation Act as expressed in the committee reports accompanying the two versions of the bill before Congress. The House Committee on Interior and Insular Affairs stated that

the Department of the Interior urgently needs to know the amount of the various scrip and rights which remain to be satisfied, in order to formulate a procedure for satisfying them. As time goes by, the lands which could be used to satisfy such rights continue to dwindle and the possibility of accurate proof of the rights becomes more remote. The Department of the Interior therefore urges that a reasonable statute of limitation be im-

---

59. Act of Aug. 5, 1955, ch. 573, § 1, 69 Stat. 534, 534–535 (emphasis added).

60. *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522, 526 (1936); see also *Harrison v. PPG Indus.*, 446 U.S. 578, 588–589, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525, 534–535 (1980); *United States v. Powell*, 423 U.S. 87, 91, 96 S.Ct. 316, 319, 46 L.Ed.2d 228, 233 (1975); *Association of Am. R.R. v. United States*, 195 U.S.App.D.C. 371, 381–382, 603 F.2d 953, 963–964 (1979); *Trinity Servs., Inc. v. Marshall*, 193 U.S.App.D.C. 96, 104, 593 F.2d 1250, 1258 (1978).

61. A typical formulation allowed the grantee to select a "patent for [a fixed] quantity of the unoccupied and unappropriated public lands of the United States, not mineral." Act of April 5, 1872, ch. 89, 17 Stat. 649, 650; see also Act of July 1, 1898, ch. 546, 30 Stat. 597, 621 ("public lands"); Act of June 8, 1872, ch. 338, 17 Stat. 333 ("lands subject to entry under the homestead laws of the United States"); Act of June 22, 1860, ch. 188, 12 Stat. 85, 87 ("any of the public lands of the United States"); Act of June 2, 1858, ch. 81, 11 Stat. 294, 295 ("any of the public lands of the United States subject to sale at private entry"); Act of July 17, 1854, ch. 83, 10 Stat. 304 ("any ... unoccupied land").

62. Brief for Appellants at 24.

63. Brief for Appellees at 10–12.

posed in order that these old accounts may be closed.[64]

Throughout the long period during which recordation was not required, the Department did not know which parcels of land would be selected. The Recordation Act was intended to identify the public lands sought by the holders of these land rights and to bar claims of those who failed to record. Because the Department wished to satisfy these land claims, it asked Congress to require their recordation.[65]

The lands available for selection under the railroad construction acts were severely limited in geographic scope. Upon the initial filing of a railroad's route location, the Department was alerted to the parcels of land that were granted within the place limits and to those subject to selection within the indemnity limits. In contrast, the Department had little or no idea as to the location of land that might be selected under authority of the enumerated scrip and warrant statutes. The Recordation Act's purpose of informing the Department of such claims to public lands was thus much less compelling in the context of the railroad construction acts. Since, however, the statutory purpose alone, though significant and suggestive, is hardly conclusive on the issue of legislative intent, we proceed to examine the legislative history of the catchall provision itself.[66]

## B. *Legislative History*

■■■■ The general purposes of the Act—to require recordation of certain rights to land, and to impose a time-bar on both registration and enforcement of unrecorded claims to such rights—was fully developed at hearings conducted by the Subcommittee on Public Lands of the House Committee on Interior and Insular Affairs, and clearly expressed in the committee reports accompanying the bill in the House and the Senate. Moreover, the scope of the catchall provision was specifically addressed in several portions of the legislative history. Assimilating these two phenomena, we gain valuable insights into the meaning of that provision.

The bill from which the Recordation Act derives was originally drafted by the Department of the Interior[67] and introduced

**64.** H.R.Rep. No. 749, 84th Cong., 1st Sess. 1 (1955) [hereinafter House Report], A.App. I–13. See S.Rep. No. 880, 84th Cong., 1st Sess. 2 (1955), *reprinted in* [1955] U.S.Code Cong. & Admin.News 2681 [hereinafter Senate Report], A.App. I–18 ("[r]ecording has not been required and as a result, the Department of the Interior is unable to ascertain accurately the amount of various scrip and related rights which remain undetermined. What the bill does in effect is to impose a reasonable statute of limitations in order that these old claims may be finally settled"). The House Report accompanying an earlier bill included a letter from the Acting Assistant Secretary of the Interior to the Speaker of the House. It read:

The purpose of the proposed legislation is to enable the Department to ascertain all outstanding lieu selection or scrip rights and bounty land warrants. There is an unknown amount of such rights and claims which run from 46 to over a hundred years old.... As time goes by the lands which could be used to satisfy the rights continue to dwindle and, as memories and records fade, the possibility of accurate proof of the rights becomes more remote.

H.R.Rep. No. 419, 82nd Cong., 1st Sess. 2 (1951) [hereinafter Original House Report], A.App. I–10. The report itself stated that the bill would "enable the Government to know how many of these claims are outstanding." *Id.*

**65.** Letter from Orme Lewis, Assistant Secretary of the Interior, to the House of Representatives (Jan. 18, 1955), *reprinted in* House Report, *supra* note 64, at 3, A.App. I–15.

**66.** The District Court endeavored to support its broad reading of the catchall phrase by noting that the Recordation Act expressly exempted "indemnity selection rights of any State, or the Territory of Alaska." *Santa Fe Pac. R.R. v. Secretary of Interior, supra* note 2, 587 F.Supp. at 751. We cannot draw from this bare circumstances the conclusion that indemnity selection rights of railroads are necessarily to be included. The selection rights referred to by the District Court are not narrowly restricted as are those granted to the railroads; instead they are rights held by states to select "any unappropriated, survey public lands within the State." 43 U.S.C. §§ 851–852 (1982). The difference between states' and railroads' indemnity selection rights does not resolve the interpretive problem confronting us, but only underscores the need to press on for the answer.

**67.** See Original House Report, *supra* note 64, at 2–4, A.App. I–10–12. We accord substantial weight to the views then expressed by the Department on the purport of the Act, particularly since they were adopted in the committee reports in both Houses of Congress. See, e.g., *Mastro Plastics v. NLRB*, 350 U.S. 270, 287–289,

in 1951. The bill listed the eight statutes enumerated in the version enacted,[68] and gave a brief summary of each in a "Schedule of Information Concerning the Principle Scrip or Lieu Selection Rights and Bounty-Land Warrants, Which are Ouststanding and Which May Be Located on or Used as Payment for the Public Lands."[69] In a letter accompanying transmission of the bill, the Acting Assistant Secretary of the Interior stated that the schedule "sets forth the presently available information with respect to some of the principal classes of rights which would be affected by the bill."[70] Each type of scrip and warrant listed concerned rights to land unconfined to particular locations, and no mention was made of any of the railroad construction acts. When the bill was reintroduced, the same schedule was presented to the House.[71]

The completeness of the listing of statutes covered by the bill was of importance to the House Subcommittee. At the hearings on the bill in 1955, the Chief of Lands for the Bureau of Land Management in the Department, Harold Hochmuth, was questioned by Representative Saylor as to how many of the "scrip or lieu selections or other rights have been presented to the Department."[72] Mr. Hochmuth replied that he did not know, and was then asked to furnish this information.[73] Mr. Hochmuth later testified:

> We searched our record to determine the number of patents, that is, titles to lands, which the Federal Government has given since 1946 for scrip, various types of scrip, and our records indicate, so far as

we can determine, 37 patents were issued totalling 3,173 acres, approximately.

> Now these were not the applications made during those years but [those] we finally finalized into patents. They may have been in the process for many, many years but, finally ended in patents issued.

> I would like to make that a part of the record.[74]

None of the "types of scrip" supplied for the record, however, was related to a railroad construction act.[75]

Later during the hearings the Acting Assistant Solicitor of the Department, James A. Lanigan, was also questioned by Representative Saylor on the same subject. Their colloquy went as follows:

> Mr. Saylor.... [H]ow many other Acts of Congress other than those which you have enumerated prior to that point in the bill are there?

> Mr. Lanigan. I would not be able to answer that offhand. I can name a few that occur to me offhand. There are some that are not mentioned here, which are Porterfield scrip, Girard [*sic*] scrip, McKee scrip, to name three of them. There may be others that I do not know offhand.

> Mr. Saylor. In view of the fact that the Department knows of certain specific Acts of Congress which authorize these rights, why have you not seen fit to mention them in this piece of legislation?

> Mr. Lanigan. I think that was just a matter of draftsmanship. We named the major outstanding types, but there are

76 S.Ct. 349, 360–361, 100 L.Ed. 309, 322–323 (1956); *United States v. Five Gambling Devices,* 346 U.S. 441, 450–452, 74 S.Ct. 190, 195–196, 98 L.Ed. 179, 188–189 (1953); *NAACP v. Civiletti,* 197 U.S.App.D.C. 259, 264, 609 F.2d 514, 519 (1979), *cert. denied,* 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980); *American Airlines, Inc. v. CAB,* 125 U.S.App.D.C. 6, 8–9, 365 F.2d 939, 941–942 (1966); *Mills v. United States,* 713 F.2d 1249, 1252 (7th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984).

**68.** See text *supra* at note 59.

**69.** Original House Report, *supra* note 64, at 3–4, A.App. I–11–12.

**70.** *Id.* at 2, A.App. I–10.

**71.** See House Report, *supra* note 64, at 4–5, A.App. I–16–17.

**72.** *Hearings Before the House Comm. on Interior and Insular Affairs, Subcomm. on Pub. Lands Regarding H.R. 2972, Recordation Act of 1955,* 84th Cong., 1st Sess. 12 (1955) [hereinafter *Hearings*], A.App. II–42. See note 80 *infra.*

**73.** *Id.* at 14, A.App. II–44.

**74.** *Id.* at 18 (1955), A.App. II–45.

**75.** *Id.* at 18, A.App. II–46.

still portions of other types of scrip. Of course, there are some scrips that have been satisfied. But the ones that we named were the ones we felt were the major ones. However, we could add every other one that we know of if the committee wishes.

\* \* \* \* \* \*

Mr. Saylor. Do you not feel this committee, if it passes this piece of legislation, should have included all of the known scrips by name rather than trying to get away with a catch-all phrase as has been used here on page 2, lines 4 to 6 of the bill?

Mr. Lanigan. We could add more varieties, but I would hate to see the catch-all phrase taken out. I think we can add every kind that we are aware of through our actions in recent years, but buried away in those many volumes of statutes sometimes there is an act in the nature of a scrip act that we might miss.[76]

Several weeks later, the director of the Bureau of Land Management wrote to the chairman of the Committee on Interior and Insular Affairs as follows:

In its February 28 [1955] hearings on H.R. 2972, a bill to require the recordation of scrip, lieu selection, and similar rights, the Pfost subcommittee requested a list of the laws authorizing such rights. Enclosed is a list of such laws insofar as we have been able to identify them. It is quite probable that rights under many of the minor laws have already been fully satisfied.[77]

This letter was reproduced in the House Report along with a list of statutes "which

authorized scrip or related rights."[78] Included were the scrip types mentioned in the text of the Act, along with 28 other kinds of scrip. Although these statutes spanned a period of 107 years, the 1866 Act at issue today is not among them. Indeed, not one of these statutes relates to aid given in support of railroad construction.

We have set forth at some length the legislative history of the catchall provision because we believe that it is decisive. Each mention of the provision as it wended its way through Congress bolsters the conviction that land selection rights stemming from the railroad construction acts were not covered by the Recordation Act. First, high-ranking officials in the Department stated initially that they had included in the bill the "major" categories of land rights to be affected. When the House Subcommittee expressed concern over which unnamed categories would be subjected to the new law, the Department insisted that only some minor laws "buried away" were left uncovered by the major categories already identified in the bill. After the Department conducted a deliberate search for land rights that would be implicated, it provided a list of laws "insofar as [the Department had] been able to identify them." No railroad construction acts were included, and none of the listed statutes involve rights to lands in particular areas. Rather, each dealt with rights in public lands generally, unattached to any geographic location.[79]

The Department urges that the "catch-all language was intended to reach beyond" the enumerated statutes.[80] It cannot ex-

---

76. *Id.* at 32–33, A.App. II–48–49.

77. House Report, *supra* note 64, at 2, A.App. I–14.

78. *Id.*

79. Some of these 28 statutes did not allow selection from *any* public land within the United States but instead limited choices to a single state or territory. See, e.g., Act of Feb. 17, 1815, ch. 45, 3 Stat. 211 (Missouri Territory); Act of July 13, 1832, ch. 214, 6 Stat. 508 (Mississippi); Act of June 9, 1880, ch. 171, 21 Stat. 171 (Florida). Given the size of the states and territories, however, such rights were closely analogous to

those enabling selection from public lands in any of the states and territories.

80. Brief for Appellees at 15. The only bit of legislative history which the Department relies on occurred during the 1955 hearings. *Hearings, supra* note 72, at 12–14, A.App. II–42–44. Representative Saylor asked Mr. Hochmuth, Chief of Lands for the Bureau of Land Management, how many scrip or lieu selection rights had been presented to the Department. Before Mr. Hochmuth could answer, Representative Udall, who though not a member had been allowed to sit with the Subcommittee interposed the history of Santa Fe's selection in the "Aztec Land Case," presumably referring to *Chapman*

plain, however, how a group of 82 statutes, enacted to facilitate construction of lines by 42 railroads, and granting rights to more than 150 million acres of land,[81] and which were themselves subject to another recordation statute,[82] could have been "buried away" [83] to such an extent as to escape notice even by the Department.[84]

We cannot believe that the Department simply overlooked the imposing array of vastly important railroad construction acts [85] when it searched for land selection rights that the forthcoming Recordation Act was to embrace. They certainly had been brought to the agency's attention, if indeed that was necessary, several years prior to consideration of the Act.[86] Moreover, according to the Department, all 42 railroads participating in the land grant had filed releases under the 1940 Act,[87] and the total area released to the Department was more than 8 million acres.[88] The argu-

ment that claims of this enormity could have been among those the Department intended to encompass within the Recordation Act, but could not be located because they represented but "small portions of . . . scrip," [89] strains credulity beyond the breaking point. The only explanation that makes sense is that land rights acquired under the railroad construction acts were of such a sufficiently different character that they were omitted from the schedule, and excluded as a category, of selection rights that the Department sought to affect by the bill that eventuated into the Recordation Act.

We think the indicia of intent in this case are so clear as to resolve definitively the ambiguity in the section of the Recordation Act that we interpret today. The members of the Subcommittee considering the bill were troubled by the inclusion of the open-ended catchall phrase and sought to clarify

*v. Santa Fe Pac. R.R.,* supra note 13. After Representative Udall finished his description of the problem confronted in *Chapman,* he asked if this did not demonstrate the need for the bill. Mr. Hochmuth replied in the affirmative, and then expanded on his answer by launching a description of "Northern Pacific scrip." The scrip he referred to, however, was issued under the Act of July 1, 1898, ch. 546, 30 Stat. 597, 621, which gave selection rights *unattached to any specific lands* to homesteaders and others who had settled on land granted to the Northern Pacific Railroad. There is nothing to indicate that Representative Udall believed that the bill covered the railroad construction acts, and it is clear that the representative of the Department, which had drafted the bill, recognized the distinction. In any event, we cannot ascribe the views of one member of Congress to either the entire Committee or Congress when all other evidence of the drafters' intent overwhelms his understanding.

81. See Statement, *supra* note 5.

82. See notes 20–23 *supra* and accompanying text.

83. *Hearings, supra* note 72, at 33 (1955), A.App. II–49.

84. See House Report, *supra* note 64, at 2, A.App. I–14 ("[e]nclosed is a list of such laws insofar as we have been able to identify them"). See also Senate Report, *supra* note 64, at 1–2, *reprinted in* [1955] U.S.Code Cong. & Admin.News 2681–2682, A.App. I–18–19 ("[a] list of the laws which authorized scrip or related rights").

85. As the Supreme Court has described the railroad construction acts,

> [e]normous areas of public lands were granted railroads, almost equal to the acreage of the New England States, New York and Pennsylvania combined. Execution of the land-grant program was marked by innumerable complex and unforeseen difficulties; its course has been beset by claims and counter-claims asserted by and between settlers, railroads, and Government. Congress, the executive agencies, and the courts have been repeatedly called upon to help resolve these conflicting claims.

*Krug v. Santa Fe Pac. R.R.,* supra note 21, 329 U.S. at 592–593, 67 S.Ct. at 541, 91 L.Ed. at 528–529 (footnotes omitted); see also *Leo Sheep Co. v. United States,* 440 U.S. 668, 670–677, 99 S.Ct. 1403, 1405–1409, 59 L.Ed.2d 677, 680–685 (1979).

86. The Recordation Act was in original draft by the Department at least by February, 1951. See Original House Report, *supra* note 64, at 2, A.App. I–10.

87. Division of Planning, Department of the Interior, *Report of the Commissioner of the General Land Office* 7 (1943), reproduced as Appendix C to Memoranda in Support of Plaintiffs' Motion for Summary Judgment, *Santa Fe Pac. R.R. v. Secretary of Interior,* Civ. No. 83–1939 (D.D.C.) (filed Dec. 15, 1983), R.Doc. 10.

88. *Id.* at 19, 47.

89. *Hearings, supra* note 72, at 32 (1955), A.App. II–48.

its scope. The Department, in response, furnished a list purportedly including all "the major outstanding types" of land rights intended to be covered,[90] and none of the fourscore railroad construction acts was listed. We thus are drawn inexorably to the conclusion that neither the drafter of the bill, nor the Subcommittee that considered it, nor the Members of Congress who pondered the committee reports accompanying it, would have had any reason to believe that rights emanating from the railroad construction acts were to be affected by the Recordation Act.[91] Accordingly, we hold that the term "lieu selection ... right" does not intercept the right held by Perrin, and reverse the District Court's

judgment and remand the case to that court for further proceedings consistent with this opinion.[92]

*Reversed and remanded.*

---

**90.** *Id.*

**91.** The Department asks us to give its interpretation of 1955 Act "substantial deference" because it is the administrative body charged with implementation of the Recordation Act, and asserts that our inquiry is limited to determining whether its interpretation is " 'sufficiently reasonable' to be accepted on judicial review." Brief for Appellees at 9. We cannot accord such deference to the agency on this question. The judiciary is the final authority on issues of statutory construction. E.g., *FMC v. Seatrain Lines, Inc.,* 411 U.S. 726, 745–746, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620, 633–634 (1973); *Volkswagenwerk v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935–936, 19 L.Ed.2d 1090, 1097–1098 (1968); *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042–1043, 13 L.Ed.2d 904, 914 (1965). "If the intent of Congress is clear, that is the end of the matter," *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694, 703 (1984), and the traditional tools of statutory construction may be employed to discern that intent. *INS v. Cardoza-Fonseca,* — U.S. —, —, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434, 457 (1987); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, supra,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9, 81 L.Ed.2d at 703 n. 9. Because the legislative history is extensive and positive on non-coverage of railroad land selection rights, we have no occasion to defer to the agency's view.

Even if the statutory intent were less clear, we could not defer uncritically to the Department. Since the passage of the Recordation Act in 1955, no selection filing has been made by a claimant under a railroad construction act. Stipulation No. 1, *Santa Fe Pac. R.R. v. Secretary of Interior,* Civ. No. 83–1939 (D.D.C.) (filed Dec. 12, 1983), R Doc. 9. Yet, in at least four instances since 1955, patents have been issued by a land office of the Department to good faith purchasers of indemnity land. See Brief for

Appellant at 10 n. 23; Brief for Appellee at 18 n. 4. Furthermore, regulations for the processing of patent applications for place and indemnity lands under the railroad construction acts are still existent, and were revised as recently as 1970. See 43 C.F.R. pt. 2630 (1986). We cannot understand why the Department would retain and revise such regulations if it thought that all railroad selection claims had been lost by failure to record under the 1955 Act. Deference to the agency's interpretation may be appropriate when "[the] interpretation has been followed consistently over a long period of time." *United States v. Clark,* 454 U.S. 555, 565, 102 S.Ct. 805, 811–812, 70 L.Ed.2d 768, 776 (1982); see also *Center for Auto Safety v. Ruckleshaus,* 241 U.S. App.D.C. 268, 272–273, 747 F.2d 1, 5–6 (1984). But an administrative construction in conflict with a prior agency interpretation does not command a high degree of respect. *INS v. Cardoza-Fonseca, supra,* — U.S. at — n. 30, 107 S.Ct. at 1221 n. 30, 94 L.Ed.2d at 457 n. 30; *International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 566, 99 S.Ct. 790, 800, 58 L.Ed.2d 808, 820 (1979); *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141–143, 97 S.Ct. 401, 410–412, 50 L.Ed.2d 343, 357–358 (1976); *United Hous. Found., Inc. v. Forman,* 421 U.S. 837, 858–859 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621, 635 n. 25 (1975); *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287, 294–295 (1973); *United Transp. Union v. Lewis,* 228 U.S. App.D.C. 447, 456, 711 F.2d 233, 242 (1983) ("[a] statutory construction to which an agency has not consistently adhered is owed no deference").

**92.** We intimate no view on whether there are other grounds, such as laches, that might suffice for denial of the patent sought. See *Southern Pac. Transp. Co. v. United States Forest Serv.,* No. 77–109 (Interior Bd. of Land App. June 2, 1978), reproduced in Admin.R.Doc. 1–C; *IBLA Decision, supra* note 1, 72 IBLA at 208 n. 11, A.App. II–15 n. 11.